JAMES N. SAUL, OSB No. 152809
ALLISON LAPLANTE, OSB No. 023614
LIA COMERFORD, OSB No. 141513
Earthrise Law Center
at Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219-7799
(503) 768-6929, jsaul@lclark.edu
(503) 768-6894, laplante@lclark.edu
(503) 768-6823, comerfordl@lclark.edu

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES, a non-profit organization, | Case No: _____ |
| Plaintiff, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| UNITED STATES FISH AND WILDLIFE SERVICE, a United States Government Agency; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, a United States Government Agency, | (Pursuant to Administrative Procedure Act and Endangered Species Act) |
| Defendants. | |

## INTRODUCTION

1.      Plaintiff Northwest Environmental Advocates ("NWEA") brings this action for

declaratory and injunctive relief against the United States Fish and Wildlife Service ("FWS")

and the United States Environmental Protection Agency ("EPA") (collectively, "Defendants")

COMPLAINT                                                                                Page 1 of 29

pursuant to the judicial review provision of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and the citizen suit provision of the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g)(1)(A).

2.      Actions taken by Defendants in 2012 and thereafter related to their analysis and approval of water quality standards developed by the State of Oregon under the federal Clean Water Act ("CWA") for the toxic pollutants arsenic, selenium, and zinc run the risk of jeopardizing threatened bull trout, an iconic salmonid fish species that resides in numerous Oregon streams and depends on cold, clean water for its survival.

3.      On July 30, 2012, FWS issued a legally flawed biological opinion ("BiOp") for EPA's proposed approval of Oregon's revised aquatic life water quality criteria for toxics. That BiOp is arbitrary, capricious, and not in accordance with law under section 706(a)(2) of the APA, 5 U.S.C. § 706(2)(A), because it (among other flaws) incorrectly concluded that Oregon's aquatic life water quality criteria for toxics would not cause jeopardy to threatened bull trout or result in the adverse modification of bull trout critical habitat, without considering relevant scientific data and information.

4.      On January 31, 2013, and again on April 11, 2014, EPA unlawfully approved Oregon's revised water quality criteria for arsenic, selenium, and zinc under CWA section 303(c)(2), 33 U.S.C. § 1313(c)(2), basing its decisions in part upon FWS' flawed BiOp and ignoring the best available science. EPA has thus also acted arbitrarily, capriciously, and not in accordance with law under section 706 of the APA. 5 U.S.C. § 706(2)(A). EPA's approval actions also violated the ESA's requirement that agencies ensure their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of habitat of such species[.]" 16 U.S.C. § 1536(a)(2).

5.      Further, NWEA alleges in the alternative that EPA unlawfully failed to reinitiate ESA consultation on Oregon's water quality criteria for zinc and arsenic in light of "new information [that] reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," 50 C.F.R. § 402.16(b), and failed to consult on Oregon's revised water quality criterion for chronic selenium after Oregon modified the criterion in light of EPA's disapproval of the originally proposed criterion. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(b).

6.      NWEA seeks an order holding unlawful and setting aside relevant portions of FWS's 2012 Oregon BiOp; remanding relevant portions of EPA's 2013 and 2014 approvals of Oregon's aquatic life water quality toxics criteria for arsenic, selenium, and zinc; directing EPA to consult or reinitiate consultation on Oregon's aquatic life water quality toxics criteria for acute and chronic zinc, chronic arsenic, and chronic selenium; and awarding NWEA its costs of litigation, including its reasonable attorney fees, pursuant to the ESA and the Equal Access to Justice Act. 16 U.S.C. § 1540(g)(4); 28 U.S.C. § 2412(d)(1)(A).

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 16 U.S.C. §§ 1540(c) and (g) (action arising under ESA and ESA citizen suit provision), 28 U.S.C. § 1331 (federal question jurisdiction), and 5 U.S.C. §§ 701 *et seq.* (APA judicial review). NWEA has challenged final agency actions as defined by the APA, 5 U.S.C. § 551(13).

8.      As required by 16 U.S.C. § 1540(g)(2) and 33 U.S.C. § 1365(b), by letter dated May 24, 2018, NWEA provided EPA with written notice of its violations of the ESA and notified EPA of NWEA's intent to file this suit.

COMPLAINT

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C.
§ 1540(G)(3)(A) because a substantial part of the events or omissions giving rise to the claims
occurred in Oregon.

10.    Pursuant to Local Rule 3-2(b), Divisional Venue is proper in this Court because a
substantial part of the events and omissions giving rise to NWEA's claims occurred in
Multnomah County.

## PARTIES

11.    NWEA is a non-profit environmental organization founded in 1969 and based in
Portland, Oregon. NWEA's mission is to work through advocacy and education to protect and
restore water quality and wildlife habitat nationwide. NWEA has spent decades working to
improve water quality programs and protect threatened and endangered species from water
pollution and degraded habitat.

12.    NWEA and its members use and enjoy the waters of Oregon for recreational,
scientific, aesthetic, and commercial purposes. NWEA and its members particularly enjoy
observing, studying, and photographing endangered and threatened species such as bull trout,
which is found in increasingly smaller and scattered portions of its historic range, with Oregon
being home to much of its remaining critical habitat.

13.    NWEA and its members are harmed by EPA's approval of Oregon's water quality
criteria for the toxic pollutants zinc, selenium, and arsenic, which was based on FWS' flawed
BiOp; by EPA's failure to reinitiate consultation on Oregon's acute and chronic zinc and chronic
arsenic criteria; and by EPA's failure to consult on, or failure to reinitiate consultation on,
Oregon's criterion for chronic selenium. Bull trout are particularly sensitive to degradation in
water quality, and thus FWS's failure to issue a scientifically sound BiOp, EPA's failure to

ensure that Oregon's toxics water quality criteria do not jeopardize bull trout, and EPA's failure to consult or reinitiate consultation on these criteria are directly contributing to the continued decline of bull trout population in Oregon.

14.    NWEA and its members have experienced, and without the relief sought by this complaint will continue to experience, the impairment of their ability to observe bull trout in its native habitat; loss of enjoyment of bull trout critical habitat waters that are or may be impaired due to arsenic, selenium, and zinc pollution; diminished aesthetic, recreational, and spiritual enjoyment of waters known to provide habitat to bull trout resulting from their knowledge that bull trout are likely in jeopardy; and other injuries stemming from the increased risk of harm to bull trout because Oregon's EPA-approved arsenic, selenium, and zinc criteria are less stringent than prevailing science shows is necessary to adequately protect the species. Unless the relief requested is granted, NWEA and its members will continue to be adversely affected and irreparably injured by the continued harm to this very special fish.

15.    NWEA's injuries are fairly traceable to Defendants' conduct. FWS' issuance of, and EPA's reliance upon, the flawed Oregon BiOp, and EPA's resulting failure to ensure against jeopardy to bull trout or adverse modification to bull trout habitat when it approved Oregon's water quality criteria for toxics, has resulted in less protective standards for arsenic, selenium, and zinc than are needed for bull trout to survive and flourish, thereby exposing bull trout to excessive toxic pollution; increasing the risk of their continued decline; and impairing NWEA and its members' aesthetic, recreational, and other interests in bull trout.

16.    NWEA's injuries would be redressed by the relief that NWEA seeks in this case. Vacatur and remand of the unlawful portions of the Oregon BiOp would require FWS to revise or reissue the BiOp after fully considering the best available science, potentially resulting in

jeopardy determinations for bull trout from Oregon's arsenic, selenium, and zinc criteria (as it

did for Idaho in 2015) and reasonable and prudent alternatives to further protect the species.

Further, upon remand of its approval of Oregon's aquatic life criteria for arsenic, selenium, and

zinc and consideration of FWS' reissued BiOp, EPA will be legally compelled to either approve

criteria that will not jeopardize bull trout (if Oregon resubmits them) or promulgate its own

criteria for Oregon, thereby reducing the pollution threats to bull trout and redressing NWEA's

and its members' injuries.

## LEGAL BACKGROUND

### The Clean Water Act and Water Quality Standards

17.    Congress adopted amendments to the CWA in 1972 in an effort "to restore and

maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. §

1251(a). The CWA establishes an "interim goal of water quality which provides for the

protection and propagation of fish, shellfish, and wildlife[.]" 33 U.S.C. § 1251(a)(2).

18.    To meet these goals, the CWA requires states to develop water quality standards

that establish, and then protect, the desired conditions of each waterway within the state's

regulatory jurisdiction. 33 U.S.C. § 1313(a). Water quality standards must be sufficient to

"protect the public health or welfare, enhance the quality of water, and serve the purposes of [the

CWA]." 33 U.S.C. § 1313(c)(2)(A). State water quality standards must be reviewed and

ultimately approved by EPA for consistency with the federal CWA. *Id.* § 1313(d)(2).

19.    Water quality standards must include three elements: (1) one or more designated

"uses" of a waterway; (2) numeric and narrative "criteria" specifying the water quality

conditions, such as maximum amounts of toxic pollutants, maximum temperature levels, and the

like, that are necessary to protect the designated uses; and (3) an antidegradation policy that

ensures that uses are protected and high quality waters will be maintained. 33 U.S.C. §§ 1313(c)(2), 1313(d)(4)(B); 40 C.F.R. Part 131, Subpart B.

20.     Uses must be designated based on consideration of "the use and value of water for public water supplies, protection and propagation of fish, shellfish, and wildlife, recreation in and on the water, agricultural, industrial, and other purposes[.]" 40 C.F.R. § 131.10(a).

21.     Water quality criteria must be set at a level necessary to protect the designated uses of a water body. 33 U.S.C. § 1313(c)(2); 33 U.S.C. § 1313(d)(4)(B); 40 C.F.R. Part 131, Subpart B. Criteria "must be based on sound scientific rationale and must contain sufficient parameters or constituents to protect the designated use." 40 C.F.R. § 131.11(a)(1). The criteria must also be set at the level necessary to protect the most sensitive use of a water body. *Id.* States may establish narrative water quality criteria "to supplement numerical criteria." 40 C.F.R. § 131.11(b)(2).

22.     States must review their water quality standards at least every three years, and submit all new and revised water quality standards to EPA for review and approval. 33 U.S.C. §§ 1313(c)(1)&(3). A state-developed water quality standard does not become effective until EPA approves it. 40 C.F.R. § 131.21(c). If EPA approves a new or revised standard, it must notify the state within 60 days of the state's submission of the standard. 33 U.S.C. § 1313(c)(3).

23.     If EPA determines that a standard is not consistent with the requirements of the CWA, within 90 days of the state's submission, EPA must notify the state of EPA's intent to disapprove the standard and specify changes to the standard that are necessary to comply with the CWA. 33 U.S.C. § 1313(c)(3). If the state does not cure the problems with the standard within a second 90-day period, EPA must "promptly" promulgate a substitute standard. *Id.*; 33 U.S.C. § 1313(c)(4)(A). EPA must also establish new or revised water quality standards

whenever the agency determines that new or revised standards are necessary to meet the requirements of the CWA. 33 U.S.C. § 1313(c)(4)(B).

## The Endangered Species Act

24.     The purpose of the ESA is to "provide a program for the conservation of . . . endangered species and threatened species" and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved[.]" 16 U.S.C. § 1531(b). One overarching requirement of the ESA is that all federal departments and agencies must "seek to conserve" threatened and endangered species. 16 U.S.C. § 1531(c)(1). The terms "conserve" and "conservation" mean "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3).

25.     The ESA requires the Secretary of Interior or Commerce to list species that he or she believes may become extinct in the near future as being either "threatened" or "endangered." 16 U.S.C. § 1533. A species is endangered if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

26.     Section 7 of the ESA enumerates the substantive and procedural obligations of federal agencies with respect to listed species. 16 U.S.C. § 1536. All federal agencies must ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species[.]" 16 U.S.C. § 1536(a)(2).

27.     The ESA's implementing regulations define jeopardy to an endangered or threatened species as "an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. § 402.02. In meeting the duty to prevent jeopardy, each agency is required to use the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

28.     Agencies must also ensure that agency actions are not likely to "result in the destruction or adverse modification of [critical] habitat." *Id.*; *see also* 50 C.F.R. § 402.14(g)(4). This is a separate determination from whether the action will jeopardize the continued existence of threatened or endangered species.

29.     Critical habitat includes areas that are "essential for the conservation of the species[.]" 16 U.S.C. § 1532(5)(A). Federal regulations define the destruction or adverse modification of critical habitat as "a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species." 50 C.F.R. § 402.02. "Such alterations may include, but are not limited to, those that alter the physical or biological features essential to the conservation of a species or that preclude or significantly delay development of such features." *Id.*

30.     Whenever a federal agency determines that a proposed action may affect one or more listed species, it must consult with the National Marine Fisheries Service ("NMFS") and/or FWS (together, "the Services"), depending on the species present. 50 C.F.R. § 402.14(a). A federal agency proposing an action that "may affect" a listed species must prepare and provide to the relevant Service a "biological assessment" of the effects of the proposed action. 16 U.S.C. §§ 1536(a)(2)&(c); 50 C.F.R. § 402.14(a).

31.     The "may affect" threshold that triggers Section 7 consultation is low; "any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (citing 51 Fed. Reg. 19,926, 19,949 (June 3, 1986)).

32.     For those actions that may affect a listed species, the Services must review all information provided by the action agency, as well as any other relevant information, to determine whether the proposed action is likely to jeopardize a listed species or destroy or adversely modify its designated critical habitat. 50 C.F.R. §§ 402.14(g)–(h). This determination is set forth in a BiOp from one of the Services. 50 C.F.R. § 402.14(h); 16 U.S.C. § 1536(b)(3)(A).

33.     In formulating a BiOp, each Service must evaluate the "effects of the action" together with "cumulative effects" on the listed species. 50 C.F.R. § 402.14(g)(3)-(4). This multi-step analysis requires the Service to consider the direct, indirect, interrelated and interdependent effects of the proposed action. 50 C.F.R. § 402.02. The Service must also consider the "environmental baseline," which includes "past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in progress." *Id.* Finally, the Service must consider any "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

34.     If, after analyzing these factors, the Service concludes that the proposed action is likely to jeopardize a listed species, or destroy or adversely modify its critical habitat, the Service

must identify and describe any reasonable and prudent alternative ("RPA") to the proposed

action that it believes would avoid jeopardy and adverse modification. 16 U.S.C. §

1536(b)(3)(A). If the Service believes there is no RPA, the BiOp must so state. 50 C.F.R. §

402.14(h)(3).

35.     If the Service finds that either a proposed action "[]or implementation of any

[RPAs] and the resultant incidental take of listed species" will not cause jeopardy or destruction

or adverse modification of critical habitat, it will also issue an incidental take statement ("ITS")

for any take of a listed species that is likely to occur. 50 C.F.R. § 402.14(i). The ITS must,

among other things, "specif[y] the impact, i.e., the amount or extent, of such incidental taking on

the species[.]" 50 C.F.R. § 402.14(i)(1)(i).

36.     Even after consultation has been completed, under certain circumstances the

action agency or the relevant Service must reinitiate consultation. For instance, the action agency

or Service must reinitiate formal consultation if "discretionary Federal involvement or control

over the action has been retained or is authorized by law and . . . [i]f new information reveals

effects of the action that may affect listed species or critical habitat in a manner or to an extent

not previously considered" or "[i]f the identified action is subsequently modified in a manner

that causes an effect to the listed species or critical habitat that was not considered in the

biological opinion[.]" 50 C.F.R. § 402.16.

**Judicial Review Under the ESA's Citizen Suit Provision and the APA**

37.     The ESA contains a citizen suit provision that authorizes suit by any person to,

*inter alia*, enjoin the United States or any of its agencies that are alleged to be in violation of any

provision of the Act or its implementing regulations. 16 U.S.C. § 1540(g)(1)(A). District courts

have jurisdiction to enforce any such provision of the Act and to award costs of litigation when appropriate. *Id.* § 1540(g)(4).

38.    The APA governs judicial review of agency decisions under the ESA that are not subject to the ESA's citizen suit provision. The APA provides a right of judicial review to persons "adversely affected or aggrieved by an agency action within the meaning of a relevant statute[.]" 5 U.S.C. § 702. Issuance of a BiOp by either of the Services marks the consummation of the ESA section 7 consultation process, and is a final agency action subject to review under APA section 702. *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

39.    Under the APA, an agency action is invalid if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Arbitrary and capricious review under the APA requires a court to determine "whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (internal quotations omitted). "A BiOp may also be invalid if it fails to use the best available scientific information as required by 16 U.S.C. § 1536(a)(2)." *Id.*

## FACTUAL BACKGROUND

### Threatened Bull Trout

40.    Bull trout is a native char, or a type of salmonid, found in the West. Bull trout have large heads and mouths compared to other salmonids and can be quite colorful depending on their environment, most often brownish green with lighter colored spots ranging from pale yellow to crimson along their sides. Bull trout have been measured as large as 41 inches in length, weighing up to 32 pounds.



Adult bull trout. Credit: Joel Sartore/ National Geographic & Wade Fredenberg/ USFWS

41.     Bull trout can be migratory, moving throughout large river systems, lakes, and even the ocean, or they may be resident, remaining in the same stream their entire lives. As they mature, migratory bull trout become primarily piscivorous fish, feeding on various other fish species.

42.     FWS listed bull trout as a threatened species under the ESA in 1999. FWS has noted that "bull trout are threatened by the combined effects of habitat degradation, fragmentation, and alterations associated with dewatering, road construction and maintenance, mining, grazing, the blockage of migratory corridors by dams or other diversion structures, poor water quality, entrainment . . . into diversion channels, and introduced nonnative species." FWS, Biological and Conference Opinion for USEPA's Proposed Approval of Oregon Water Quality Criteria for Toxics, July 30, 2012 (hereafter, "Oregon BiOp") at 20.

43.    Bull trout have very specific habitat requirements. FWS has identified multiple "primary constituent elements" ("PCEs") of bull trout designated critical habitat that are essential for the conservation of bull trout, including cold water temperature, "[a]n abundant food base," and "[s]ufficient water quality and quantity such that normal reproduction, growth, and survival are not inhibited." Oregon BiOp at 23–30.

44.    There are nearly 3,000 miles of rivers and streams and over 30,000 acres of lakes and reservoirs within Oregon that have been designated by FWS as critical habitat for bull trout. Oregon BiOp at 47. The figure below depicts designated bull trout critical habitat in Oregon:



Oregon BiOp at 47.

45.     In 2012, FWS noted widespread agreement in the scientific literature concerning the many factors related to human activities that have contributed to degraded PCEs in bull trout critical habitat, resulting in a "legacy of degraded habitat conditions." Oregon BiOp at 25. These factors include: (1) fragmentation and isolation of local bull trout populations due to the building of dams and water diversions that have eliminated habitat, altered water flow and temperature, and blocked migration paths; (2) alterations in sediment and water temperature resulting from forest and rangeland practices and intensive development of roads; (3) the introduction of nonnative fish species; (4) urban and residential development; and (5) degradation of foraging, migratory, and overwintering habitat resulting from reduced prey base, roads, agriculture, development, and dams. *Id*. at 25. FWS also expressly recognized that climate change may directly threaten bull trout critical habitat as water temperatures increase. *Id.*

### ESA Consultation for Oregon's
### Revised Aquatic Life Water Quality Standards for Toxics

46.     This is the third case brought by NWEA in its years-long effort to ensure that Oregon's aquatic life water quality criteria for toxics are sufficiently protective of threatened and endangered species—particularly salmonids like bull trout—that depend on Oregon's rivers and streams for spawning, foraging, and migration.

47.     First, in 2006, NWEA brought suit against EPA to compel it to review Oregon's July 8, 2004 submission of revised water quality criteria for toxic pollutants under the CWA, which had remained stagnant for years even in the face of new science. *See Nw. Envtl. Advocates v. Envtl. Protection Agency*, No. 06-cv-479-HA (D. Or. filed Apr. 7, 2006). That case settled with a court-enforceable deadline for EPA to take action on Oregon's submission.

COMPLAINT                                                                    Page 15 of 29

48.     Second, in 2010, NWEA brought suit against FWS and the National Marine

Fisheries Service ("NMFS") to force those agencies to fulfill their obligations under the ESA to

prepare the Oregon BiOp, which had languished for years. *See Nw. Envtl. Advocates v. Natl.*

*Marine Fisheries Service*, No. 10-cv-00907-BR (D. Or. filed Aug. 2, 2010). That case settled

with a court-enforceable deadline for FWS and NMFS to complete their BiOps on Oregon's

toxics criteria.

49.     DEQ amended its original water quality criteria submission on April 23, 2007 and

again on July 21, 2011. The revised standards included, among other revisions, changes to the

freshwater aquatic life criteria for the toxic pollutants arsenic, selenium, and zinc. This action

triggered consultation with the Services under the ESA and its implementing regulations. 16

U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

50.     On July 30, 2012, FWS issued the Oregon BiOp for the revisions to Oregon's

aquatic life water quality criteria for toxic pollutants.

51.     In identifying threats to bull trout specific to Oregon, FWS stated in the Oregon

BiOp that "[i]ncreased stream temperatures and the presence of toxic substances both have

tremendous potential to pose a threat to bull trout within Oregon," as "poor water quality and

physical barriers have left most core areas for bull trout extremely vulnerable to decline."

Oregon BiOp at 48. FWS also acknowledged that increased water temperatures pose barriers to

bull trout foraging, migration, and reproduction, stating that "[b]ull trout found within Oregon

require high quality, cold water for spawning." *Id.* The presence of toxins would have variable

effects depending on location, ranging from injury to death. *Id.*

52.     In discussing the potential effects on bull trout from chronic exposure to arsenic at

Oregon's proposed criterion level of 150 μg/L, FWS relied primarily on surrogate bluegill data

for evaluating both growth and survival effects. Oregon BiOp at 189. FWS claimed that there

was "insufficient chronic toxicity data for bull trout or any other more closely related salmonid."

*Id.* Based on the bluegill data, FWS concluded that effects to bull trout caused by chronic

exposure to arsenic at the proposed criterion level would result in 79 individual bull trout killed

every three years for 25 years, with the affected area including surface waters along 820.6 miles

of bull trout habitat. *Id.* at 191.

      53.    FWS based its analysis of the potential effects on bull trout from acute exposure

to zinc at Oregon's proposed criterion level of 120 μg/L on direct data testing bull trout

sensitivity to acute zinc exposure. Oregon BiOp at 214. FWS concluded that bull trout exposure

to Oregon's proposed acute zinc criterion was likely to kill up to 507 adult bull trout every 3

years for 25 years. *Id.* at 218.

      54.    FWS based its analysis of the potential effects on bull trout from chronic exposure

to zinc at Oregon's proposed criterion level of 120 μg/L on surrogate data for brook trout, a

species from the same genus as the bull trout. Oregon BiOp at 215. FWS concluded, based on

modeling of the brook trout data, that bull trout exposure to Oregon's proposed chronic zinc

criterion was likely to kill up to 266 adult bull trout and injure up to another 1,370 individual bull

trout through reduced fitness (i.e., reduced growth and reproductive capability) every 3 years for

25 years. *Id.* at 218.

      55.    Considering the potential effects on listed species from chronic exposure to

selenium at Oregon's proposed criterion level of 5 μg/L ("dissolved" selenium), FWS noted that

the "toxic effects of selenium are primarily from the bioaccumulation pathway," or through

dietary exposure rather than direct water exposure. Oregon BiOp at 318, 332. Citing prior

scientific studies, FWS estimated as many as 20% of the juvenile bull trout population could be affected, killing up to 259 individual bull trout. *Id.* at 333, 335, 337.

56.    Summarizing the estimated aggregate effects of exposure to all of the toxic pollutants at Oregon's proposed criteria levels, FWS estimated the likely mortality of up to 1,929 adult bull trout and injury (as a result of reduced fitness) of up to another 6,953 adult bull trout every 3 years for 25 years. Oregon BiOp at 218.

57.    FWS ultimately concluded that EPA's approval of Oregon's revised water quality standards for toxics was not likely to jeopardize the continued existence of bull trout, reasoning that the analysis had assumed a "worst case scenario" (exposure to all toxics at criteria levels) and claiming that the actual likelihood of exposure to toxics was low. Oregon BiOp at 342–49. FWS further determined that the proposed action would not adversely modify or destroy bull trout critical habitat. *Id.* at 351. Because FWS anticipated that take of bull trout could occur in the form of harm or harassment, FWS issued an ITS which required EPA to fulfill a two-step "reasonable and prudent measure" (RPM): (1) to provide FWS with reports every two years summarizing DEQ's monitoring efforts on water quality criteria, and (2) develop methods to estimate toxicity of contaminants to the vernal pool fairy shrimp, another listed species. *Id.* at 358–59.

58.    Regarding bull trout present in the Columbia and Snake Rivers specifically, FWS consistently asserted throughout the Oregon BiOp that the likelihood of actual exposure to toxic metals at criteria levels would be low because (1) "the greatest potential for exposure would be during low flows . . . when it would be unlikely for bull trout to be present because low flows most often occur . . . when water temperature is unsuitable for bull trout and most adults would be . . . further upstream" and (2) "bull trout [can] move through or avoid the highest

concentrations of [toxics] they encounter within large streams[.]" Oregon BiOp at 181, 190, 193, 202, 205, 208, 210–12, 216, 336. FWS failed to support this assertion with supporting data despite noting that bull trout can still be found in warmer river systems throughout the Columbia River basin. *Id*. at 30.

59.      In other words, in the Oregon BiOp FWS discussed no evidence indicating that bull trout are actually absent or unlikely to be present during times with the greatest potential for exposure to toxics. There was also no record evidence indicating that bull trout can or will actually "move through or avoid" high concentrations of toxics they encounter. FWS claimed that bull trout could minimize potential harm from chronic exposure to selenium by moving through or avoiding high concentrations of selenium, despite noting that bioaccumulation or dietary exposure, not direct exposure, is the critical risk with respect to selenium toxicity. Oregon BiOp at 318, 332, 336.

60.      On January 31, 2013, EPA approved DEQ's proposed revisions to Oregon's water quality criteria for acute and chronic zinc, but disapproved the revisions to the criterion for chronic selenium and took no action on the chronic arsenic criterion. *See* USEPA, Letter from Daniel D. Opalski, Director, Office of Water and Watersheds, to Greg Aldrich, Administrator, Water Quality Division, Oregon Department of Environmental Quality (Jan. 31, 2013).

61.      Oregon later submitted to EPA a more stringent criterion for chronic selenium and re-submitted the same chronic arsenic criterion. EPA approved these criteria on April 11, 2014. *See* USEPA, Letter from Daniel D. Opalski, Director, Office of Water and Watersheds, to Wendy Wiles, Administrator, Environmental Solutions Division, Oregon Department of Environmental Quality (Apr. 11, 2014).

**FWS' 2015 BiOp for Idaho's Revised Water Quality Standards**

62.    Three years after the Oregon BiOp, on June 25, 2015, FWS issued a BiOp for the

State of Idaho's revisions to its water quality standards for toxic pollutants, which, like Oregon,

included revisions to Idaho's criteria for chronic arsenic, chronic selenium, and acute and

chronic zinc. FWS, Biological Opinion for the Idaho Water Quality Standards for Numeric

Water Quality Criteria for Toxic Pollutants (June 25, 2015) (hereafter, "Idaho BiOp").

63.    Idaho's proposed criteria for chronic arsenic, chronic selenium, and acute and

chronic zinc were identical to or stricter than those considered by FWS in the Oregon BiOp, and

one of the ESA-listed species addressed in the Idaho BiOp is bull trout. However, in stark

contrast to its conclusions in the Oregon BiOp, FWS found in the Idaho BiOp that those same or

stricter proposed criteria were likely to jeopardize the continued existence of numerous

threatened or endangered species, including bull trout.

64.    Idaho's proposed chronic arsenic criterion of 150 μg/L was identical to Oregon's

proposed arsenic criterion. The Idaho BiOp cited a number of studies pre-dating the Oregon

BiOp, including a study of bull trout exposed to elevated levels of arsenic conducted in 2010.

FWS cited the same study in the Oregon BiOp but did not discuss the results in relation to

Oregon's proposed standard for chronic arsenic. Where the 2012 Oregon BiOp had used

surrogate bluegill data, the Idaho BiOp instead used the 2010 bull trout study data along with

multiple pre-2012 studies on rainbow trout and cutthroat trout, which are more closely related to

bull trout. Based on these studies, FWS concluded in the Idaho BiOp that "the proposed chronic

criterion for arsenic is likely to cause adverse effects to the bull trout in the form of reduced

growth and tissue damage," noting that such "effects have been documented in salmonids at

concentrations much lower than the proposed chronic arsenic criterion of 150 µg/L." Idaho BiOp at 148.

65.     Idaho's proposed aquatic life water quality criteria for zinc were 117 µg/L (chronic) and 118 µg/L (acute), both stricter than Oregon's proposed criterion of 120 µg/L for both acute and chronic zinc. Yet in the Idaho BiOp, FWS concluded that zinc concentrations at the proposed acute and chronic criteria levels were "likely to impair the capability of bull trout habitat to provide for the normal reproduction, growth, and survival of bull trout." Idaho BiOp at 204.

66.     Idaho's proposed aquatic life water quality criterion for chronic selenium of 5 µg/L (as "total recoverable" selenium) was more stringent than Oregon's proposed chronic selenium criterion of 5 µg/L (as "dissolved" selenium), because 5 µg/L "total recoverable" selenium is equivalent to 4.6 µg/L "dissolved" selenium. See EPA Clean Water Act 303(c) Determinations on Oregon's New and Revised Aquatic Life Toxic Criteria Submitted on July 8, 2004, and as Amended by Oregon's April 23, 2007 and July 21, 2011 Submissions (January 30, 2013), at 49–50. Both the Oregon BiOp and the Idaho BiOp cited a consultation conducted jointly by FWS and NMFS which, like a number of other prior studies, concluded that 5 µg/L of total selenium in water may not always be protective, whereas a concentration of 2 µg/L likely would be. Idaho BiOp at 192; Oregon BiOp at 330–32. Based on the available data, in Idaho FWS concluded that the proposed chronic selenium criterion would have significant adverse effects on bull trout. Idaho BiOp at 193.

67.     FWS ultimately concluded in the Idaho BiOp that Idaho's proposed water quality standards for chronic arsenic, chronic selenium, and acute and chronic zinc were likely to jeopardize bull trout and bull trout critical habitat. Id. at 257–58. FWS accordingly set forth

RPAs requiring EPA to either promulgate or approve new water quality criteria for each
pollutant consistent with the opinion within a limited time frame; FWS also required interim
protective measures to be put in place while state and federal authorities implemented each RPA,
including effluent monitoring and zones of passage for bull trout where appropriate. *See id.* at
267–72, 280–83.

68.    The Oregon BiOp was legally flawed in multiple respects. FWS failed to use the
"best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), by: (1) inappropriately
relying on surrogate bluegill data in analyzing the effects of chronic arsenic on bull trout, despite
the availability of direct bull trout data and more closely related surrogate data that was
undoubtedly before the agency; (2) failing to analyze the bioaccumulation pathway with regard
to exposure to chronic arsenic; (3) failing to analyze the toxicity of zinc based on water hardness;
(4) concluding that a criterion of 5 μg/L for chronic selenium would protect bull trout despite
clearly stating in its own 2000 consultation that the available data does not support a criterion of
5 μg/L as protective of salmonids, thereby ignoring its own experts; and (5) claiming that
adverse effects to bull trout in larger rivers would be minimal because either bull trout
supposedly can and will avoid high concentrations of toxics or could be absent during low flows,
despite a complete lack of data to support these assumptions.

69.    Because EPA relied on a legally flawed BiOp in approving Oregon's water
quality criteria for these toxics, it failed to ensure that its actions would not jeopardize the
threatened bull trout. Every day that passes with these unsafe water quality criteria in place poses
more risk of injury and lethal harm to bull trout and thus more injury to NWEA and its members.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### FWS' Violations of the APA, 5 U.S.C. § 706(2)(A):
#### Arbitrary and Capricious BiOp

70.    NWEA incorporates and realleges all preceding paragraphs as if fully set forth herein.

71.    In its Oregon BiOp consulting on EPA's proposed approval of Oregon's aquatic life water quality criteria for toxics, FWS determined that the proposed criteria for chronic arsenic, chronic selenium, and acute and chronic zinc would not jeopardize the threatened bull trout or destroy or adversely modify bull trout critical habitat.

72.    FWS' issuance of the Oregon BiOp was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A), for at least the following reasons:

(A)    FWS reached its "no jeopardy" determination for bull trout resulting from chronic exposure to arsenic at Oregon's proposed criterion level of 150 µg/L based primarily upon surrogate bluegill data, ignoring existing and more relevant studies of the effects of arsenic on bull trout, cutthroat trout, and rainbow trout;

(B)    FWS based its "no jeopardy" determination in part upon its conclusion that "the greatest potential for exposure would be during low flows . . . when it would be unlikely for bull trout to be present because low flows most often occur . . . when water temperature is unsuitable for bull trout and most adults would be . . . further upstream" and (2) "bull trout [can] move through or avoid the highest concentrations of [toxics] they encounter within large streams" even though the record contains no scientific or factual support for these conclusions;

(C)     FWS failed to use the best available scientific information as required by 16

U.S.C. § 1536(a)(2), ignored other relevant scientific data and information related

to the direct and cumulative impacts of toxics on bull trout, and failed to analyze

relevant factors sufficiently;

(D)     FWS failed to articulate a rational connection between its findings in the Oregon

BiOp and its conclusion that approval of Oregon's revised water quality standards

for arsenic, selenium, and zinc would not jeopardize the continued existence of

bull trout.

73.     The Court should therefore hold unlawful and set aside the Oregon BiOp or

relevant portions thereof pursuant to section 706(2) of the APA, 5 U.S.C. § 706(2).

### SECOND CLAIM FOR RELIEF

**EPA's Violations of ESA § 7(a)(2):**
**Failure to Ensure that Approval of Oregon's**
**Revised Aquatic Life Water Quality Standards is not Likely to**
**Jeopardize the Continued Existence of Bull Trout**

74.     NWEA incorporates and realleges all preceding paragraphs as if fully set forth

herein.

75.     Section 7(a)(2) of the ESA imposes a strict substantive duty on federal agencies to

ensure that their actions do not cause jeopardy to endangered or threatened species. 16 U.S.C. §

1536(a)(2).

76.     An action agency violates its ESA section 7(a)(2) duty when it relies upon a

flawed or legally deficient BiOp as the basis for its actions. *See Ctr. for Biological Diversity v.*

*U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127–28 (9th Cir. 2012).

77.    EPA's January 31, 2013 and April 11, 2014 approval actions regarding Oregon's revised aquatic life water quality standards for toxics were federal actions subject to section 7(a)(2) of the ESA.

78.    By relying upon the arbitrary and capricious Oregon BiOp when it approved Oregon's revised aquatic life water quality standards for toxics on January 31, 2013 and April 11, 2014, EPA violated its obligations under ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2).

79.    EPA's violations of ESA section 7(a)(2) warrant an order enjoining EPA from further violations of that section and vacating and remanding EPA's January 31, 2013 and April 11, 2014 approvals or relevant portions thereof under the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1).

**THIRD CLAIM FOR RELIEF**
**(In the Alternative)**

**EPA's Violation of 50 C.F.R. § 402.16(b):**
**Failure to Reinitiate Consultation on Oregon's Arsenic and Zinc Water Quality Criteria**

80.    NWEA incorporates and realleges all preceding paragraphs as if fully set forth herein.

81.    ESA regulations require action agencies to reinitiate formal consultation under ESA Section 7 if "discretionary Federal involvement or control over the action has been retained or is authorized by law and . . . [i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(b).

82.    EPA retains or is authorized by law to have discretionary involvement or control over Oregon's water quality criteria for toxics. *See*, *e.g.*, 33 U.S.C. § 1313(c)(4)(B) (CWA

provision requiring EPA to set forth new or revised water quality standards when necessary); 40 C.F.R. §§ 131.21, 131.5, 131.22 (CWA implementing regulations).

83.    Even if the Oregon BiOp was legally valid, there is new information that reveals potential effects of Oregon's chronic arsenic and acute and chronic zinc criteria on bull trout or its critical habitat in a manner or to an extent not previously considered by FWS or EPA. This new information includes (A) information and analysis contained in FWS' subsequent 2015 Idaho BiOp, in which FWS concluded that the same criteria EPA approved in Oregon will jeopardize bull trout in Idaho, and (B) studies, data, and information referenced or discussed in the 2015 Idaho BiOp related to rainbow, cutthroat, and bull trout that existed at the time of, but were not considered in, the Oregon BiOp.

84.    This new information triggered EPA's obligation under 50 C.F.R. § 402.16(b) to reinitiate consultation with FWS regarding the effects of Oregon's revised chronic arsenic and acute and chronic zinc aquatic life water quality criteria on bull trout, yet EPA failed to reinitiate such consultation.

85.    EPA's ongoing failure to reinitiate consultation warrants an order enjoining EPA from further violations of 50 C.F.R. § 402.16(b) and vacating and remanding EPA's January 31, 2013 and April 11, 2014 approvals or relevant portions thereof until such time as such reinitiated consultation is complete.

### FOURTH CLAIM FOR RELIEF
### (In the Alternative)

### EPA's Violations of ESA § 7(a)(2):
### Failure to Consult on Oregon's Selenium Water Quality Criteria

86.    NWEA incorporates and realleges all preceding paragraphs as if fully set forth herein.

87.    On January 31, 2013, EPA disapproved Oregon's proposed chronic selenium criterion that FWS had considered in the Oregon BiOp. In light of this disapproval, Oregon proposed a modified criterion for chronic selenium, which EPA approved on April 11, 2014.

88.    EPA's April 11, 2014 approval was a separate agency action that "may affect" ESA-listed species or their critical habitat, thereby triggering EPA's obligation to engage in formal consultation with FWA under ESA Section 7(a)(2).

89.    EPA did not consult with FWS regarding its April 11, 2014 approval of Oregon's modified and re-submitted aquatic life water quality criterion for chronic selenium, presumably relying upon the conclusions in the Oregon BiOp.

90.    EPA's ongoing failure to initiate consultation with FWS specifically regarding its April 11, 2014 approval warrants an order enjoining EPA from further violations of ESA Section 7(a)(2) and vacating EPA's April 11, 2014 approval or relevant portions thereof until such time as such consultation is complete.

### PRAYER FOR RELIEF

WHEREFORE, NWEA respectfully requests that this Court:

A.    Declare that the Oregon BiOp for EPA's proposed approval of Oregon's aquatic life water quality criteria for toxics, or relevant portions thereof, was arbitrary, capricious, and not in accordance with law;

B.      Declare that EPA violated Section 7(a)(2) of the ESA when it approved Oregon's revised aquatic life water quality criteria for arsenic, selenium, and zinc on January 31, 2013 and April 11, 2014;

C.      Declare that EPA violated ESA Section 7(a)(2) and 50 C.F.R. § 402.16(b) by failing to consult or reinitiate consultation on Oregon's aquatic life water quality toxics criteria for acute and chronic zinc, chronic arsenic, and chronic selenium;

D.      Set aside the Oregon BiOp or relevant portions thereof and remand to FWS with instructions to issue a new BiOp for EPA's approval of Oregon's revised aquatic life water quality criteria for arsenic, selenium, and zinc;

E.      Set aside relevant portions of EPA's January 31, 2013 and April 11, 2014 approvals of Oregon's aquatic life water quality criteria for arsenic, selenium, and zinc, and remand to EPA for completion of the required ESA consultations;

F.      Award NWEA its costs of litigation, including its reasonable attorneys' fees, pursuant to 16 U.S.C. § 1540(g)(4) and 28 U.S.C. § 2412; and

G.      Grant such other and further relief as the Court may deem just and proper.

Dated this 27th day of July, 2018.

Respectfully submitted,

/s/ James N. Saul
JAMES N. SAUL, OSB No. 152809
ALLISON LAPLANTE, OSB No. 02361
LIA COMERFORD, OSB No. 141513
Earthrise Law Center
at Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219-7799
(503) 768-6929, jsaul@lclark.edu
(503) 768-6894, laplante@lclark.edu
(503) 768-6823, comerfordl@lclark.edu

*Attorneys for Plaintiff Northwest*
*Environmental Advocates*

COMPLAINT