JEAN E. WILLIAMS
Deputy Assistant Attorney General
JOHN H. MARTIN, CO #32667
Wildlife & Marine Resources Section
Environment & Natural Resources Division
United States Department of Justice
999 18th St., South Terrace Suite 370
Denver, CO 80202
john.h.martin@usdoj.gov
Telephone (303) 844-1383
Facsimile (303) 844-1350

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **NORTHWEST ENVIRONMENTAL ADVOCATES,** | Case No.  3:18-CV-01420-AC |
| **Plaintiff,** | |
| **v.** | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPLETE AND SUPPLEMENT THE U.S. FISH AND WILDLFE SERVICE'S ADMINISTRATIVE RECORD** |
| **UNITED STATES FISH AND WILDLIFE SERVICE and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** | |
| **Defendants.** | |

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ........................................................................................................... 1

STANDARD OF REVIEW ............................................................................................. 3

ARGUMENT .................................................................................................................. 6

   I.   Plaintiff May Not Complete FWS' Administrative Record With Exhibits
       FWS Did Not Consider In Preparing the 2012 Biological Opinion...................................... 6

  II.  The Court May Not Consider FWS' 2015 Idaho Biological Opinion as
       Extra-Record Evidence Because It Is Post-Decisional.......................................... 9

 III.  Plaintiff Fails To Prove Any of the "21 Studies" Fit the "Relevant Factors"
       Exception to Supplement the FWS' Administrative Record. ........................................... 11

      A.  FWS Addressed the Topics In the Four Proffered Papers Concerning
         Zinc............................................................................................................... 15

      B.  FWS Addressed the Topics In the Five Papers Concerning Selenium........................... 18

      C.  FWS Addressed the Topics In the 12 Papers Concerning Arsenic................................ 20

  IV.  The Claims Against EPA Are Governed By the APA's Standard and Scope
       of Review And Thus Are Limited To the Administrative Record. .................................. 25

CONCLUSION................................................................................................................ 31

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE**

*Alaska Oil & Gas Ass'n v. Pritzker*,
    840 F.3d 671 (9th Cir. 2016) ........................................................................ 31

*Animal Def. Council v. Hodel*,
    840 F.2d 1432 (9th Cir. 1988) ................................................................. 3, 6, 12

*Asarco, Inc. v. EPA*,
    616 F.2d 1153 (9th Cir.1980) ....................................................................... 5, 28

*Ass'n of Pac. Fisheries v. EPA*,
    615 F.2d 794 (9th Cir. 1980) ........................................................................ 10

*Audubon Soc'y of Portland v. Zinke*,
    2017 WL 6376464 (D. Ore. Dec. 12, 2017) ............................................... 6, 7

*Balt. Gas & Electric Co. v. Nat. Res. Def. Council*,
    462 U.S. 87 (1983) ..................................................................................... 24, 27

*Barapind v. Enomoto*,
    400 F.3d 744 (9th Cir. 2005) ........................................................................ 31

*Bar MK Ranches v. Yuetter*,
    994 F.2d 735 (10th Cir. 1993) ....................................................................... 6

*Bark v. Northrop*,
    2 F. Supp. 3d 1147 (D. Or. 2014) ................................................................. 13

*Bldg. Indus. Ass'n of the Bay Area v. U.S. Dep't of Commerce*,
    792 F.3d 1027 (9th Cir. 2015) ...................................................................... 31

*Cabinet Mountains Wilderness v. Peterson*,
    685 F.2d 678 (D.C. Cir. 1982) ...................................................................... 26

*Camp v. Pitts*,
    411 U.S. 138 (1973) ...................................................................................... 4

*Chandler v. Roudebush,*
    425 U.S. 840 (1976) ............................................................................ 26

*Citizens to Pres. Overton Park v. Volpe,*
    401 U.S. 402 (1971) ............................................................................ 27

*City of Sausalito v. O'Neill,*
    386 F.3d 1186 (9th Cir. 2004) ............................................................ 26

*Cook Inletkeeper v. EPA,*
    400 F. App'x 239 (9th Cir. 2010) ..................................................... 6, 7

*Ctr. for Biological Diversity v. Badgley,*
    335 F.3d 1097 (9th Cir. 2003) ............................................................ 26

*Ctr. for Biological Diversity v. FWS,*
    450 F.3d 930 (9th Cir. 2006) ......................................................... 4, 10

*Ctr. for Biological Diversity v. Jewell,*
    2014 WL 116408 (D. Ariz. Jan. 13, 2014) ......................................... 14

*Dickinson v. Zurko,*
    527 U.S. 150 (1999) ............................................................................ 26

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.,*
    423 U.S. 326 (1976) ............................................................................ 25

*Fence Creek Cattle Co. v. U.S. Forest Serv.,*
    602 F.3d 1125 (9th Cir. 2010) ......................................................... 5, 13

*Florida Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) .............................................................................. 6

*Friends of the Earth v. Hintz,*
    800 F.2d 822 (9th Cir. 1986) ....................................................... 4, 5, 13

*Golden Gate Salmon Ass'n v. Ross,*
    2018 WL 3129849 (E.D. Cal. June 22, 2018) ............................. 6, 7, 8, 9

*Greater Yellowstone Coal. v. Servheen*,
    665 F.3d 1015 (9th Cir. 2011)........................................................................ 26

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*,
    383 F.3d 1082 (9th Cir. 2004)........................................................................ 26

*In re Delta Smelt Consol. Cases*,
    2010 WL 2520946 (E.D. Cal. June 21, 2010).............................................. 13

*In re Osborne*,
    76 F.3d 306 (9th Cir. 1996)........................................................................... 28

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
    681 F.3d 1006 (9th Cir. 2012)............................................................ 26, 30, 31

*Kern Cty. Farm Bureau v. Allen*,
    450 F.3d 1072 (9th Cir. 2006)........................................................................ 11

*Klamath Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
    2014 WL 525116 (D. Or. Feb. 6, 2014)........................................................ 10

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008)........................................................................... 4

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005)............................................................... passim

*McCrary v. Gutierrez*,
    495 F. Supp. 2d 1038 (N.D. Cal. 2007) .......................................................... 6

*Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*,
    602 F.3d 687 (5th Cir. 2010).......................................................................... 27

*National Ass'n of Home Builders v. Defenders of Wildlife*,
    551 U.S. 644 (2007)....................................................................................... 29

*New 49'ers v. Karuk Tribe*,
    133 S. Ct. 1579 (2013) .................................................................................. 26

*Newton Cty. Wildlife Ass'n v. Rogers*,
  141 F.3d 803 (8th Cir. 1998) ................................................................. 27

*Ninilchik Traditional Council v. United States*,
  227 F.3d 1186 (9th Cir. 2000) ............................................................... 25

*NW. Ecosystem All. v. FWS*,
  475 F.3d 1136 (9th Cir. 2007) ............................................................... 26

*Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*,
  460 F.3d 1125 (9th Cir. 2006) ................................................................. 5

*Occidental Eng'g Co. v. INS*,
  753 F.2d 766 (9th Cir. 1985) ................................................................... 4

*Pac. Shores Subdiv., Cal. Water Dist. v. U.S. Army Corps of Eng'rs*,
  448 F. Supp. 2d 1 (D.D.C. 2006) ................................................... passim

*Parravano v. Babbitt*,
  837 F. Supp. 1034 (N.D. Cal. 1993) ........................................................ 5

*Pinnacle Armor v. United States*,
  923 F. Supp. 2d 1226 (E.D. Cal. 2013) ........................................ 7, 8, 13

*Pub. Power Council v. Johnson*,
  674 F.2d 791 (9th Cir. 1982) ............................................................. 4, 5

*Rybacheck v. EPA*,
  904 F.2d 1276 (9th Cir. 1990) .............................................................. 12

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
  723 F. Supp. 2d 1247 (E.D. Cal. 2010) ................................................ 24

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
  2008 WL 11400759 (E.D. Cal. Dec. 23, 2008) ................................ 23-24

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ........................................................ passim

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ................................................................. 14

*Sierra Club v. McLerran*,
    2012 WL 5449681 (W.D. Wash. Nov. 6, 2012) ..................................... 30

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    295 F.3d 1209 (11th Cir. 2002) ............................................................. 27

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
    100 F.3d 1443 (9th Cir. 1996) .......................................................... 10, 11

*The Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*,
    667 F. Supp. 2d 111 (D.D.C. 2009) ................................................ passim

*Thompson v. U.S. Dep't of Labor*,
    885 F.2d 551 (9th Cir. 1989) ................................................................ 4, 7

*Tri Valley Cares v. U.S. Dep't of Energy*,
    671 F.3d 1113 (9th Cir. 2012) ............................................................... 10

*Trout Unlimited v. Lohn*,
    2006 WL 1207901 (W.D. Wash. May 4, 2006) ..................................... 24

*United States v. Carlo Bianchi & Co.*,
    373 U.S. 709 (1963) ......................................................................... 25, 27

*United States v. Easterday*,
    564 F.3d 1004 (9th Cir. 2008) ............................................................... 31

*United States v. Home Concrete & Supply, LLC*,
    132 S. Ct. 1836 (2012) .......................................................................... 28

*Univ. of Wash. v. Sebelius*,
    2011 WL 6447806 (W.D. Wash. Dec. 22, 2011) ................................... 12

*Village of False Pass v. Clark*,
    733 F.2d 605 (9th Cir. 1984) ................................................................. 26

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
   435 U.S. 519 (1978) ................................................................................................ 27

*W. Watersheds Project v. Kraayenbrink*,
   538 F. Supp. 2d 1302 (D. Idaho 2008) ........................................................... 29, 30

*Washington Toxics Coalition v. EPA*,
   413 F.3d 1024 (9th Cir. 2005) ................................................................................ 28

*Western Watersheds Project v. Kraayenbrink*,
   632 F.3d 472 (9th Cir. 2011) ...................................................................... 28, 29, 30

*WildEarth Guardians v. U.S. Forest Serv.*,
   2011 WL 11717437 (D. Ariz. Apr. 26, 2011) ....................................................... 30

*Winnemem Wintu Tribe v. U.S. Forest Serv.*,
   2014 WL 3689699 (E.D. Cal. July 24, 2014) ....................................................... 13

## STATUTES

5 U.S.C. § 704 ............................................................................................... 28, 29
5 U.S.C. § 706 ................................................................................................. passim
5 U.S.C. 706(2)(A) .......................................................................................... 2, 3, 4
16 U.S.C. § 1533(b)(1)(A) .............................................................................. 14, 20
16 U.S.C. § 1536(a)(2) .................................................................................... passim
16 U.S.C. § 1540(g)(1)(A) .............................................................................. 26, 33
33 U.S.C. § 1313(c) ............................................................................................... 1
33 U.S.C. § 1314(a) ............................................................................................... 1

## INTRODUCTION

Defendants the United States Fish and Wildlife Service ("FWS") and the United States Environmental Protection Agency ("EPA") (collectively "Defendants") respectfully submit this Memorandum in Opposition to Plaintiff's Motion to Complete and Supplement the U.S. Fish and Wildlife Service's Administrative Record. *See* ECF 20 ("Pl. Br."). This case arises from the EPA's approval of the State of Oregon's adoption of a suite of numeric water quality criteria for twenty different "toxic pollutants" applicable to all surface waters of the state of Oregon. The State of Oregon submitted this set of new and revised criteria for review by EPA pursuant to Clean Water Act Section 303(c), 33 U.S.C. § 1313(c). All of the criteria adopted by Oregon are equivalent to the National Recommended Water Quality Criteria that EPA published in 2002 as guidance to states pursuant to Clean Water Act Section 304(a), 33 U.S.C. § 1314(a). AR 031756[1] [EPA Biological Evaluation at 2-2]. The water quality standard for each pollutant specifies the numeric concentration that each surface water of the state may not lawfully exceed, or that the State will seek to attain where the waters exceed the standards.[2]

Before making its approval, EPA also consulted with the FWS to ensure that its approval of these standards in the surface waters across Oregon would not jeopardize the continued existence of any species listed under the Endangered Species Act ("ESA") or result in the

---

[1] Both FWS and EPA have filed their respective administrative records. ECF 14. All citations in this brief to documents contained in the FWS administrative record are denoted with the prefix "FWS." Any citation to a document in the EPA administrative record will include the prefix "EPA." The documents Plaintiff made exhibits to its motion bear the prefix "NWEA."

[2] As pertinent to this case, the criteria specify the dissolved concentrations of the pollutant in the water column that should not be exceeded in order to protect a particular designated use of the waters. Here the designated use is aquatic life. The aquatic life freshwater acute criterion refers to the maximum average concentration for one hour that should not be exceeded more than once in a three-year period and the aquatic life freshwater chronic criteria refers to the average concentration for 96 hours (four days) that should not be exceeded more than once in a three-year period.

destruction of adverse modification of any designated critical habitat for such species. On July 30, 2012, FWS issued a Biological Opinion and Incidental Take Statement (the "Oregon BiOp") analyzing the effects of EPA's approval of the water quality standards on numerous ESA-listed species. *See* FWS 0001 [Oregon BiOp], FWS 0473 [Transmittal letter for Oregon BiOp]. The Oregon BiOp concludes, as relevant here, that EPA's approval of the water quality standards for zinc, selenium, and arsenic will not jeopardize bull trout; nor would it destroy or adversely modify designated critical habitat for bull trout. FWS 0001, FWS 0473. FWS also concluded that exposure of bull trout to these three toxic elements at the acute and chronic criteria levels would, however, likely harm a number of individual fish in the locations where such exposure was determined likely to occur.[3] FWS exempted that specific level of harm to bull trout from the ESA's prohibitions in an Incidental Take Statement concluding the Oregon BiOp. FWS 0370-71 [BiOp at 355-56].

On July 27, 2018, Plaintiff Northwest Environmental Advocates filed its Complaint. It alleges that FWS violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), in issuing the Oregon BiOp. ECF 1 ¶ 72. It also brings three claims against EPA. It claims that: (a) EPA violated ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2), by relying on the Oregon BiOp; (b) EPA must reinitiate ESA consultation on the arsenic and zinc criteria because of new information contained in a different Biological Opinion FWS issued in 2015 evaluating water quality criteria in Idaho ("the Idaho BiOp"); and (c) EPA is violating ESA Section 7(a)(2)

---

[3] FWS found that EPA's approval of the standards would take, i.e. kill, 507 adult bull trout every three years from exposure to the acute criterion for zinc, take 601 adult bull trout every three years from exposure to the chronic criteria for all three elements, and injure 1,370 adult bull trout experiencing reduced fitness due to reductions in growth or reproduction every 3 years from exposure to the chronic criterion for zinc. FWS 0235-36 [BiOp Tables 4-17, 4-18], FWS 0371.

because it never consulted on its approval of Oregon's criterion for chronic selenium. ECF 1 ¶¶ 76, 83, 89.

On February 20, 2019, FWS and EPA lodged their respective Administrative Records with the Court. ECF 14. Plaintiff now moves the Court to add 21 documents and the Idaho BiOp to the record for judicial review of its sole APA claim against FWS. Pl. Br. at 2. Although Plaintiff seeks no relief with respect to EPA's administrative record, it does state its intention to offer the same documents as evidence in support of its claims against EPA without seeking prior leave of Court. Its mistaken theory is that those claims are brought under the ESA's citizen suit provision rather than the APA, and are not subject to judicial review limited to the agencies' administrative records, or subject to the record review limitations discussed below.

There is no basis to allow Plaintiff to either complete or supplement FWS' administrative record with the 22 documents it offers. Plaintiff ignores its significant burden to justify either completion or supplementation of an agency administrative record, and offers essentially no argument on any of the individual documents it has proffered, treating them instead as an undifferentiated mass of documents that should be considered as a unified group. The Court should not consider these documents because it is not necessary. FWS' administrative record is sufficiently inclusive of all pertinent issues related to the effects of arsenic, selenium, and zinc on bull trout to permit judicial review. Likewise EPA's administrative record provides all of the information that the Court needs, and all the information that the Court is legally permitted to consider, to resolve Plaintiff's several claims against EPA for its continued reliance on FWS' Oregon BiOp.

**STANDARD OF REVIEW**

Judicial review under the APA is deferential, such that a court may only set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A). The task of the reviewing court is to apply this standard of review to the administrative record the agency presents to the reviewing court. *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988), *modified,* 867 F.2d 1244 (9th Cir. 1989); 5 U.S.C. § 706. This narrow standard prohibits a court from engaging in *de novo* fact-finding or substituting its judgment for the agency's judgment. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*).

The administrative record consists of "all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (citation omitted). "Certainly, there may be issues of fact before the administrative agency. However, the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). Accordingly, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986).

Only limited circumstances can justify expanding judicial review beyond the agency's administrative record. *Pub. Power Council v. Johnson*, 674 F.2d 791, 793 (9th Cir. 1982). An agency's record may be supplemented (1) when necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, (3) when necessary to explain technical terms or complex subject matter, or (4) when the plaintiffs make a showing of agency bad faith. *Ctr. for Biological Diversity v. FWS*, 450 F.3d 930, 943 (9th Cir. 2006). "It is the plaintiffs' burden to demonstrate

that one or more of these exceptions apply." *Parravano v. Babbitt*, 837 F. Supp. 1034, 1039

(N.D. Cal. 1993) aff'd, 70 F.3d 539 (9th Cir. 1995).[4]

The Ninth Circuit has recognized these "narrow exceptions" to the record review rule and

made it clear that these exceptions are to be "narrowly construed and applied" so that they "do[]

not undermine the general rule." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005);

*Johnson*, 674 F.2d at 794 (exceptions must be applied cautiously to avoid swallowing the rule).

"Were the federal courts routinely or liberally to admit new evidence when reviewing agency

decisions, it would be obvious that the federal courts would be proceeding, in effect, *de novo*

rather than with the proper deference to agency processes, expertise, and decision-making."

*Lands Council*, 395 F.3d at 1030; *see also Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*,

460 F.3d 1125, 1144 (9th Cir. 2006).

Plaintiff thus has a "heavy burden" of showing that its extra-record documents fall within

one of these narrow exceptions to the record review rule and are "<u>necessary</u> to adequately review

the [agency]'s decision." *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th

Cir. 2010) (emphasis added). Supplementation (or completion) of a record will not be allowed

based on the mere proposition that the agency should have considered other information. *See,*

*e.g., Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir.1980) ("[C]onsideration of the evidence

to determine the correctness or wisdom of the agency's decision is not permitted[.]"). Nor will

supplementation be permitted merely to bolster the record or supply background information.

*Hintz*, 800 F.2d at 829 ("The discovery sought by the appellants might have supplied a fuller

---

[4] A plaintiff may move to "complete" the record, or to "supplement" it, or both, as Plaintiff
requests here. "Completing the record" means adding materials the agency considered but failed
to include in the record. This rationale is embodied in the second of the exceptions recognized
by the Ninth Circuit. The other recognized exceptions to the APA record review rule are more
accurately understood to "supplement the record" because their application results in adding
materials the Court finds necessary to permit a proper evaluation of the agency's decision

record, but otherwise does not address issues not already there.") (footnote omitted). Rather, the moving party must demonstrate instead that failure to supplement the record will "effectively frustrate [] judicial review." *Hodel*, 840 F.2d at 1436.

## ARGUMENT

**I.  Plaintiff May Not Complete FWS' Administrative Record With Exhibits FWS Did Not Consider In Preparing the 2012 Biological Opinion.**

In reviewing a request to complete an administrative record with documents an agency has already declined to include, courts "assume that an 'agency properly designated the [a]dministrative [r]ecord absent clear evidence to the contrary.'" *Cook Inletkeeper v. EPA*, 400 F. App'x 239, 240 (9th Cir. 2010) (quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993)); *Audubon Soc'y of Portland v. Zinke*, Case No. 1:17-cv-00069-CL, 2017 WL 6376464 *3 (D. Ore. Dec. 12, 2017); *Golden Gate Salmon Ass'n v. Ross*, Case No. 1:17-cv-01172, 2018 WL 3129849, at *4 (E.D. Cal. June 22, 2018) (same). The presumption derives from recognition "that the agency determines what constitutes the 'whole' administrative record, because 'it is the agency that did the considering, and that therefore is in a position to indicate initially which of the materials were before it – namely, were directly or indirectly considered.'" *Pac. Shores Subdiv., Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006) (citation and quotations omitted); *see also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) (stating that "[t]he task of the reviewing court is to apply the appropriate APA standard of review ... based on <u>the record the agency presents</u> to the reviewing court") (emphasis added).

The party seeking to supplement the record must overcome this presumption by producing clear evidence to the contrary. *Golden Gate Salmon Ass'n*, 2018 WL 3129849, at *4; *McCrary v. Gutierrez*, 495 F. Supp. 2d 1038, 1041 (N.D. Cal. 2007).  Thus "plaintiffs must put

forth concrete evidence to show that the record is incomplete," and that "the [proffered] documents were considered by the decision makers involved in the determination." *Golden Gate Salmon Ass'n*, 2018 WL 3129849, at *4 & *9 (citation and quotation omitted); *see also Pinnacle Armor v. United States*, 923 F. Supp. 2d 1226, 1232, 1239 (E.D. Cal. 2013) (Plaintiffs must demonstrate with clear evidence that the documents at issue were considered by decision makers in the relevant decision making process.)   Plaintiff has not made that showing here.

Plaintiff offers no evidence, let alone the required showing of "clear evidence," that FWS considered, at any level, any of the 21 documents Plaintiff seeks to add to FWS' administrative record.  Plaintiff's failure to prove FWS considered the 21 papers compels denial of Plaintiff's request.  *Cook Inletkeeper*, 400 F.App'x at 240; *see also Pac. Shores Subdiv.*, 448 F. Supp. 2d at 7 (Plaintiff's burden not met by assertions that documents are relevant, were before or in front of the agency at the time it made its decision, and were inadequately considered.)  Plaintiff cites to *Thompson v. U.S. Department of Labor* (Pl. Br. at 10), but this decision actually undercuts its argument by showing that actual consideration is a key requirement to prevail on a record completion theory.  885 F.2d at 556.  The *Thompson* court ordered the administrative record to be completed with letters the government decision maker admittedly and actually considered, either directly or indirectly, in making the challenged decision because the letters were attached to a motion the Secretary admitted considering in making his decision. *Id.* at 556; *cf. Audubon Soc'y*, 2017 WL 6376464 *5 (denying record completion with documents merely cited to agency by a commenter).

Even apart from the absence of evidence that FWS considered the 21 documents in preparing the Oregon BiOp, Plaintiff's rationales to "complete" FWS' administrative record also fail to make any pertinent point.  Plaintiff's allegation that each of the studies was published in a peer-reviewed scientific journal or was "otherwise made available" to FWS employees

(whatever that ambiguous phrase entails) is wholly inadequate to meet Plaintiff's burden.[5]  Pl. Br. at 9.  Neither assertion, assuming them to be true, shows that Paul Henson, the State Supervisor of the FWS Oregon Fish and Wildlife Office who issued the Oregon BiOp or any FWS biologist who worked on the Oregon BiOp actually considered any of the documents.  This omission is fatal, as actual consideration by an agency employee involved in preparing the agency decision is the touchstone for Plaintiff to prevail on its request, in stark contrast to Plaintiff's mistaken theory of constructive notice.  *Pinnacle Armor*, 923 F. Supp. 2d at 1239; *Golden Gate Salmon Ass'n*, 2018 WL 3129849 *9.  Nor may Plaintiff meet its burden with the proposition that each of the documents addresses, in some fashion, one of the three chemicals at issue in the proposed water quality standards that FWS was analyzing in the Oregon BiOp. Mere relevance of Plaintiff's papers to the issues presented by an agency decision is not the test. *Pac. Shores Subdiv.*, 448 F. Supp. 2d at 6.

Finally, Plaintiff argues unpersuasively that its exhibits belong in the administrative record for the 2012 Oregon BiOp because they were cited by FWS in a different BiOp issued in 2015 that evaluated the effects of water quality standards in Idaho.  Pl. Br. at 10.  It is essentially immaterial that a different office of the FWS (i.e., the Idaho Field Office) cited these papers

---

[5] Plaintiff offers no proof that any of the articles it proffers were even "made available" to FWS before it issued the BiOp on July 30, 2012.  Notably, Plaintiff's Exhibit ("PX") 15 has a 2013 publication date, indicating it was published after FWS issued the Oregon BiOp.  ECF 21-2 at NWEA_00239.  Likewise, it is doubtful that three other articles were publically available on or before that date.    PX 5 was a "platform presentation," i.e. a conference exhibit, for a presentation given at a conference on November 16, 2011.  PX 22 (ECF 21-3) at NWEA_000720.  There is no evidence when that item of conference materials was made publicly available on the internet website provided.  A further example is PX 9, an excerpt from a book published on an unknown date in 2012, maybe even after issuance of the Oregon BiOp. ECF 21 at ¶ 10 & ECF 21-1 at NWEA_0065 (Further, Plaintiff's photocopied PX 9 is substantially illegible).  Similarly, PX 12, another excerpt from a different book, was also published on an unknown date in 2012.  ECF 21 at ¶ 13; ECF 21-2 at NWEA_00150.

(amongst a host of others) in 2015 in a different BiOp issued three years after the BiOp here and regarding a different decision by EPA.  This argument fails because a request to complete an administrative record cannot be based on an agency's consideration of the same document in a different decision, regardless of any asserted nexus between the two decisions.  *See, e.g., Golden Gate Salmon Ass'n*, 2018 WL 3129849 *9 (refusing to add order completion with documents agency considered in "an earlier, related decision."); *The Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 667 F. Supp. 2d 111, 112 (D.D.C. 2009) (refusing to add earlier BiOp analyzing a related federal action).  Hence, because Plaintiff offers no evidence that any of its exhibits were relied on by the FWS authors of the 2012 Oregon BiOp, Plaintiff's demand to complete the administrative record with these 21 exhibits should be rejected.[6]

## II.  The Court May Not Consider FWS' 2015 Idaho Biological Opinion as Extra-Record Evidence Because It Is Post-Decisional.

Plaintiff also moves the Court to supplement FWS' administrative record with a BiOp FWS issued in 2015 regarding EPA approval of water quality standards in Idaho, as well as a request to supplement the FWS administrative record with the 21 studies discussed above.[7]  Pl.

---

[6] As stated in a joint motion by the parties (ECF 18), FWS agreed in May to add several scientific articles to its administrative record that had been inadvertently omitted from the record, primarily because FWS determined that it had considered the articles during its extensive literature review even if it did not cite those articles in the Oregon BiOp itself.  FWS will add the agreed-upon documents to its administrative record and file that addition with the Court at an appropriate point after the Court rules on this motion.  None of those articles are at issue, however, in Plaintiff's current motion.

[7] Specifically, Plaintiff seeks an order that "the agencies" must "supplement the record" with the 21 studies discussed above, as well as with the 2015 Idaho BiOp.  Pl. Br. at 10.  Plaintiff's request for an order compelling Defendants to lodge Plaintiff's extra-record evidence in the Court's docket (i.e. the judicial record), but not in either agencies' distinct administrative records, is misplaced.  Defendants do not offer Plaintiff's exhibits as their own evidence. Plaintiff's arguments in its motion go only to whether the Court may even consider any extra-record documents consistent with the APA standard of review in 5 U.S.C. § 706, not any other

Br. at 10. Plaintiff contends that the Court may consider all 21 studies, as well as the 2015 Idaho BiOp in its entirety, on the basis that such documents are permissible extra-record evidence to determine whether the agency has considered all relevant factors. *Id.* at 11 & 13, (citing *Lands Council*, 395 F.3d at 1030).

Plaintiff's contention that the "relevant factors" exception allows the Court to consider the 21 studies is discussed in the next section *infra*.   However, Plaintiff's request for extra-record consideration of FWS' Idaho BiOp fails for a more basic reason.   In this Circuit, parties may not use post-decision information "as a new rationalization either for sustaining or attacking an agency's decision." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603 (9th Cir. 2014) ("*Jewell*") (quoting *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996); *Tri Valley Cares v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130–31 (9th Cir. 2012) ("The post-decision bar, however, renders this exception [consider all relevant factors] inapplicable, as the [] report was completed over nearly two years after the commencement of this litigation."); *Ctr. for Biological Diversity*, 450 F.3d at 943 (quoting *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 811–12 (9th Cir. 1980)); *Klamath Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, No.1:12-cv-1558-CL, 2014 WL 525116, at *4-5 (D. Or. Feb. 6, 2014) (same).   That simple rule applies here to bar consideration of the post-decisional 2015 Idaho BiOp.

---

objections to admissibility.  Defendants reserve all such other objections until Plaintiff itself offers any extra-record document into evidence, as contrasted to the different issues about the APA record-review rule posed by the instant motion.  For example, the 21 articles would appear to be inadmissible hearsay, especially when Plaintiff explains what the authors may have meant as it seeks to question FWS' scientific judgment.

It would be doubly improper for Plaintiff to utilize the 2015 Idaho BiOp to make the one argument that ostensibly requires this bit of extra-record evidence: that FWS ignored the "best available scientific data" standard of 16 U.S.C. § 1536(a)(2) and hence failed to consider a relevant factor. Pl. Br. at 11.   By its terms, that provision of the ESA limits the requirement to information that is actually available. *Jewell*, 747 F.3d at 602 ("Essentially, FWS cannot ignore available biological information.") (quoting *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006)).  There is no doubt that the 2015 BiOp was not available for FWS' consideration before it issued the 2012 Oregon BiOp, and hence the interpretation of the scientific literature and other discussion and findings of the 2015 Idaho BiOp may not be considered in evaluating the sufficiency of FWS's 2012 Biological Opinion.

In *Southwest Center for Biological Diversity* the Ninth Circuit denied a plaintiffs' request for extra-record consideration of a letter authored by the defendant agency, dated a month after the agency decision, that outlined mandatory ESA consultation procedures that were not followed in the agency decision.  100 F.3d at 1450.  The key principle underlying this ruling was the fact that the letter was post-decisional.  The extensive and controlling Ninth Circuit authority, cited above, applying this simple rule precludes extra-record consideration of the 2015 Idaho BiOp in judicial review of the 2012 Oregon BiOp.  As demonstrated by the decisions in *Southwest Center* and *Jewell*, it makes no difference that the claims at hand may involve the ESA.  The post-decisional nature of the 2015 Idaho BiOp compels the Court to reject Plaintiff's request for extra-record consideration of this document.

### III.  Plaintiff Fails To Prove Any of the "21 Studies" Fit the "Relevant Factors" Exception to Supplement the FWS' Administrative Record.

Plaintiff's request for consideration of the 21 articles under the first exception to the record review rule, *see Lands Council*, 395 F.3d at 1019, to determine "whether FWS has

considered all relevant factors," Pl. Br. at 11, similarly lacks merit. Plaintiff asserts that the 2012 BiOp "lacks discussion of the best scientific data available," as required by 16 U.S.C. § 1536(a)(2), in order to demonstrate the BiOp is arbitrary and capricious. *Id.* at 11. Plaintiff makes this point in such conclusory fashion that its assertion proves only that Plaintiff has entirely shirked its heavy burden to show the exception applies in any fashion to any of the 21 articles, or even moreso to the 2015 Idaho BiOp that it would contrast against the Oregon BiOp.

First, Plaintiff relies on an overbroad interpretation of the "relevant factors" exception. It ignores the basic principle that the exception must be narrowly construed and applied to avoid swallowing the record review rule. *Lands Council*, 395 F.3d at 1030. Plaintiff improperly turns the extra-record analysis on its head with the proposition that a document is admissible where Plaintiff claims a need for the evidence in its merits argument. The law actually imposes a different and steeper burden on Plaintiff before allowing consideration of such evidence under the relevant factors exception.

Before extra-record material may be considered under this exception, Plaintiff must first prove that the existing administrative record is inadequate. *Hodel*, 840 F.2d at 1437 (review of extra-record evidence inappropriate where plaintiff "makes no showing that the district court needed to go outside the administrative record to determine whether the [agency] ignored information"). Plaintiff's motion does not state any argument that FWS' BiOp and supporting administrative record is so bare on the effects of zinc, selenium, and arsenic on bull trout to "effectively frustrate[] judicial review." *Id.* at 1436; *Univ. of Wash. v. Sebelius*, No. 11-cv-625-RSM, 2011 WL 6447806, at *2 (W.D. Wash. Dec. 22, 2011) (same); *Rybacheck v. EPA*, 904 F.2d 1276, 1296 n. 25 (9th Cir. 1990) (denying motion to supplement where "original record [ ] adequately explains the basis of [the agency's decision] and demonstrates that the [agency]

Page 12 of 33:  DEFENDANTS' MEMO IN OPPOSITION TO MOTION TO COMPLETE AND SUPPLEMENT THE U.S. FISH AND WILDLFE SERVICE'S ADMINISTRATIVE RECORD

considered the relevant factors"); *In re Delta Smelt Consol. Cases*, No. 1:09-CV-1053 OWW DLB, 2010 WL 2520946, at *2 (E.D. Cal. June 21, 2010) (same); *Bark v. Northrop*, 2 F. Supp. 3d 1147, 1153 (D. Or. 2014) (rejecting venture outside of the record where "plaintiffs do not demonstrate how the 30,000-page record and 1,500-page supplementary record are so insufficient as to frustrate effective judicial review of plaintiffs' claims").

In order to meet its burden, "a plaintiff must establish more than just that the [extra-record] document is relevant. In fact, the document in question must do more than raise 'nuanced points' about a particular issue; it must point out an 'entirely new' general subject matter that the defendant agency failed to consider." *Pinnacle Armor,* 923 F. Supp. 2d at 1234 (quoting *In Re Delta Smelt*, 2010 WL 2520946, at *5). "[T]he 'relevant factors' exception only applies when [f]ederal [d]efendants fail to consider a general subject matter that is demonstrably relevant to the outcome of the agency's decision, not when specific hypotheses and/or conclusions are omitted from consideration." *In Re Delta Smelt*, 2010 WL 2520946, at *5. That is, only where there are "gaps or holes" in the agency's record that work to frustrate judicial review under the APA is supplementation appropriate. *Fence Creek Cattle*, 602 F.3d at 1131 ; *Winnemem Wintu Tribe v. U.S. Forest Serv.*, No. 2:09-cv-1072, 2014 WL 3689699, at *10 (E.D. Cal. July 24, 2014) ("Necessity exists only where the record is so scant that the court cannot carry out this function" of judicial review under the APA) (citation omitted). Conversely, supplementation is not permitted to bolster the record or supply background information. *Hintz*, 800 F.2d at 829 ("The discovery sought by the appellants might have supplied a fuller record, but otherwise does not address issues not already there.") (footnote omitted).

Plaintiff's resort to the ESA's "best available scientific data" standard does not change this framework for narrowly applying the relevant factors exception or lessen its burden to

demonstrate the necessity of extra-record evidence and identify issues left unaddressed by the administrative record.  *Jewell*, 747 F.3d at 602–04; *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014).  The *Jewell* and *Locke* decisions both addressed claims alleging similar deficiencies and oversights in other BiOps issued under the ESA; and both decisions resoundingly disapprove of a permissive approach to admitting extra-record evidence to evaluate the sufficiency of the Services' analysis of the pertinent scientific information.

Another on-point ESA example is presented by the decision denying supplementation in *Ctr. for Biological Diversity v. Jewell*, No. CV-12-02296-PHX-DGC, 2014 WL 116408, at *1 (D. Ariz. Jan. 13, 2014).  Plaintiffs there challenged FWS' decision under Section 4 of the ESA that bald eagles in the Sonoran Desert did not qualify for listing as threatened or endangered under the ESA.  Section 4 of the ESA, like Section 7(a)(2), requires FWS to make its species listing decision on the basis of the best available scientific information. 16 U.S.C. § 1533(b)(1)(A).  Plaintiffs in that case sought to supplement FWS' record for the listing decision with a scientific article on the significance of peripheral populations, arguing that its importance had been demonstrated by FWS' reliance on the article in a different listing decision. *Ctr. for Biological Diversity*, 2014 WL 116408, at *2.  That is Plaintiff's basic argument here too.  The court there nonetheless denied supplementation based on the fact that FWS had considered the "general subject matter" of the relation of desert bald eagles to bald eagles as a whole, and rejected the contention that supplementation was necessary to show that FWS should have also considered the additional information in the article. *Id*; *see also The Cape Hatteras Access Pres. All.*, 667 F. Supp. 2d at 116 (denying supplementation of FWS administrative record with prior BiOp on related action given adequacy of existing record).

Page 14 of 33:  DEFENDANTS' MEMO IN OPPOSITION TO MOTION TO COMPLETE AND SUPPLEMENT THE U.S. FISH AND WILDLFE SERVICE'S ADMINISTRATIVE RECORD

Plaintiff has failed to carry its burden to prove that each of the 21 articles or the 2015 Idaho BiOp is "necessary" to carry out APA review. *Id.* at 130.  Indeed, the only point Plaintiff makes about each article is in the "relevance" column in its Appendix, along with a summary of its use in the 2015 Idaho BiOp.  Pl. Br. at 15-20.  But assertions about relevance do not address Plaintiff's burden to show the deficiencies in FWS' present administrative record for the Oregon BiOp.[8]  Indeed, Plaintiff wholly ignores FWS' administrative record, not even citing to the Oregon BiOp that is the very first document in FWS's administrative record.[9]  The Oregon BiOp and its administrative record address each of the issues Plaintiff seemingly asserts that FWS ignored.

A. FWS Addressed the Topics In the Four Proffered Papers Concerning Zinc.

---

[8] For the reasons explained *supra*, Plaintiff may not use the 2015 Idaho BiOp to characterize the 21 articles, as the 2015 BiOp is not itself permissible extra-record evidence.

[9] Plaintiff's Exhibit (PX) 23 purports to be Plaintiff's selection of excerpted pages from the Oregon BiOp.  Needless to say, Plaintiff's 25-page excerpt ignores important elements.  As one example, it omits FWS' detailed description of the quantitative methods and other analyses it used to perform its risk assessment of the effect that exposure to each criteria could be expected to have on each listed species.  FWS 0435-0472 [BiOp Appendix 1].  As FWS itself stated: "This information is essential to understanding our effects determinations contained in Section 4 of this Biological Opinion." FWS 0435.  Thus Plaintiff's motion mischaracterizes the Oregon BiOp.  To choose just one example, Plaintiff says the Oregon BiOp lacks any discussion of the effects of selenium on bull trout.  Pl. Br. at 3, n.2.  Not so, as the BiOp summarizes the likely effects of selenium exposure at the criterion level on bull trout specifically at FWS 0350-352 [BiOp at 335-337].  And the preceding pages discuss selenium toxicity and how FWS arrived at its conclusion.  As will become clear as this case moves into merits briefing, Plaintiff prefers the more general qualitative reasoning of the Idaho BiOp to the more data-intensive, quantitative-based ecological risk assessment methodology FWS applied in the Oregon BiOp.   The conclusions in the two BiOps are not inconsistent, as FWS explained to EPA after Plaintiff threatened this lawsuit.  EPA 019896.

Page 15 of 33:  DEFENDANTS' MEMO IN OPPOSITION TO MOTION TO COMPLETE AND SUPPLEMENT THE U.S. FISH AND WILDLFE SERVICE'S ADMINISTRATIVE RECORD

Plaintiff offers four articles to supplement FWS' analysis of the effects of zinc on bull trout. Plaintiff's Exhibit (PX) 9, PX 16, PX 17, PX 21. One is a review paper--a chapter from a book describing, inter alia, general toxicity characteristics of zinc--that does not contain original research or data. PX 9. The information in PX 9 is general in nature and is cumulative of other sources cited in the Oregon BiOp. *See* FWS 025348-025525 (Sorensen 1991), specifically FWS 025445, 025448- 025449, 025456, 025457, 025461- 025463; and FWS 007586-007711 (Eisler 1993), specifically FWS 007592- 007594. The remaining references evaluate avoidance behavior of trout exposed to water containing zinc, or address reduction in prey items following zinc exposure. The Oregon BiOp and FWS' record already address behavioral changes in fish and potential reduction of prey from zinc exposure. These four exhibits do not identify any new issue about effects of zinc on bull trout that is not already considered in the existing record, and are not appropriate extra-record supplementation.

The Oregon BiOp acknowledges that all the toxic pollutants such as zinc (along with the other substances at issue in the consultation) present an indirect threat to bull trout through direct reductions in the abundance of prey species or by reducing the carrying capacity of prey species habitat. FWS 0063 [ BiOp at 48 ]. This general conclusion is supported by evidence already in the record. FWS 040354-040527 (FWS 2010d), specifically FWS 040357, 040369, 040386-040387; FWS 007043-007052 (Donald and Alger 1993), specifically FWS 007048; FWS 0023502-0023543 (Rieman and McIntyre 1993), specifically FWS 023506; and FWS 000238 and tables at FWS 000232, 000235-000236 [ BiOp at 217, 220-21]. Moreover, the Oregon BiOp concludes that both the acute and chronic criteria for zinc approved by EPA will have adverse effects on bull trout, both in terms of direct mortality and through reduced fitness by sublethal effects. FWS 0229-233 [BiOp 214-218].

The Oregon BiOp also expressly considered the effect of the zinc criteria on bull trout critical habitat, especially the requirement that such habitat have an abundant food base for bull trout (primary constituent 3) and sufficient water quality to not inhibit reproduction, growth and survival (primary constituent 8).  FWS 00237-246 [BiOp at 222-232].   Here again, FWS found that water quality at the zinc criteria levels proposed by Oregon would likely reduce prey species for bull trout and adversely affect important life-cycle functions, including sublethal effects such as reduced fitness through a lower competitive ability and reduced vigor.  FWS 00238-247 [BiOp 222-230].   The BiOp notes that:

> "[t]he body of literature we used in developing our model indicates that . . . zinc . . . [has] the potential to adversely affect the food chain by reducing the number or size of forage fish available to bull trout.  Additionally this literature indicates that . .. zinc [has] high toxicity to macroinvertebrates, which are an important food source for bull trout during early life stages."

FWS 00245 [BiOp at 230]; FWS 007586-007711 (Eisler 1993), specifically 007589, 007642-007651; FWS 005705-005710 (Cooper 2009).  In sum, there is no issue in this case about whether either criterion for zinc would cause harm to bull trout when water quality is at the criterion limit (i.e. the maximum permitted under state law for the relevant time period).  FWS also quantified the bull trout mortality and injury it anticipated would result when water quality is at the criterion levels and presented that specific estimate of bull trout "take", as derived by the quantitative methodology it used to characterize exposure of, and the ecological effects of the criteria to, bull trout.

FWS has identified and addressed the general subject of zinc toxicity to bull trout, especially considering sublethal effects and effects on prey species, that Plaintiff claims requires the use of extra-record evidence.  Against FWS' existing record, it appears that Plaintiff would raise only nuanced points about these issues.  Its extra-record documents on zinc do not fill gaps

Page 17 of 33:  DEFENDANTS' MEMO IN OPPOSITION TO MOTION TO COMPLETE AND SUPPLEMENT THE U.S. FISH AND WILDLFE SERVICE'S ADMINISTRATIVE RECORD

on any entirely new general subject matter that FWS allegedly failed to consider.  FWS'

administrative record on this issue is adequate for judicial review and Plaintiff's supplementation

request lacks the necessary basis.

      B.  <u>FWS Addressed the Topics In the Five Papers Concerning Selenium</u>.

      There are five references identified by the plaintiff that relate to selenium.  PX 4, PX 7,

PX 11, PX 13, PX 15.  One paper was undoubtedly published after the Oregon BiOp was issued

on July 30, 2012.[10]  PX 15.  Two papers are summary review papers that do not contain original

research or data.  PX 4, PX 11.  The remaining two references on selenium contain primary

research, but their results are confounded by the presence of contaminants other than selenium or

sources other than dissolved concentrations of selenium in the water column, such as

contaminated sediments.  PX 7, PX 13.  One of these references indicated abundance of fish prey

could be reduced from selenium, but the pathway for selenium to prey items was likely from

contaminated sediment rather than water.  PX 7.

      Plaintiff claims these articles are relevant to the general issue of the impact of selenium

on bull trout, with two articles specifically offered for the impacts of selenium on reproduction.

Pl. Br. 15-20.  It seems to offer these articles to provide general information about the toxicity

---

[10] Plaintiff offers this article to prove "what selenium water aquatic life criteria would be
protective for aquatic species." Pl. Br. at 19. This is a plainly improper purpose for extra-record
evidence under the APA standard of review, as a direct challenge to the propriety of FWS' "no
jeopardy" conclusion.  It is also important to note the different endpoints of establishing
protective water quality standards as compared to the ESA's jeopardy standard. FWS' inquiry in
a BiOp is not what water quality is sufficiently protective of a species to avoid all possibility of
harm from any pathway, but instead an analysis of whether the proposed agency action is likely
to jeopardize a species' continued existence or result in destruction or adverse modification of its
critical habitat.

and exposure risks of selenium to bull trout, including transfer of selenium through various trophic levels of the food web.

The Oregon BiOp documented these general processes using other references, and especially by referencing a prior ESA consultation on applicable water quality standards in California, known as the California Toxics Rule. FWS 00333-38 [BiOp 318-23]; FWS 00345-352 [BiOp 330-337]. FWS here relied upon and incorporated the analysis in the California Toxics Rule into the existing record in this case, and, in so doing, covered the issues in Plaintiff's exhibits, especially the pertinent points in PX 7 and PX 11. *See, e.g.* PX 22 at NWEA 00608 (citing to California Toxics Rule BiOp – aka "USFWS and NMFS 2000" -as parallel cite to PX 11 (Lemly and Skorupa 2007)). The Oregon BiOp relied on an extensive body of literature to identify the specific trophic level (based on changes in diet at various stages of development) for application of the appropriate bioaccumulation factor to apply to its model for determining effects. FWS 00333-38 [BiOp 318-23]; FWS 00345-352 [BiOp 330-37]. A detailed description of the methodology begins on page 330 of the Oregon BiOp; while Table 4-62 summarizes and tabulates the key findings from the literature, including from articles reviewing effects to fish reproduction. FWS 00345-349. The articles Plaintiff cites are simply duplicative on a topic FWS has already identified, researched, and evaluated in the Oregon BiOp.

The Oregon BiOp found that water quality at the criterion level for selenium would cause a reduction in survival and growth and also some degree of reproductive failures in bull trout. *See* FWS 00350-52 [BiOp at 335-337]; FWS 025271-025305 (Skorupa et. al., 2004), specifically FWS 025287; FWS 006445-006483 (DeForest and Adams 2011), specifically FWS 006452-006454, 006456-006457; FWS 006507-006513 (DeForest et.al., 2011b), specifically FWS 006509. FWS calculated that the proposed criterion for selenium could kill 20% of the bull trout

Page 19 of 33: DEFENDANTS' MEMO IN OPPOSITION TO MOTION TO COMPLETE AND SUPPLEMENT THE U.S. FISH AND WILDLFE SERVICE'S ADMINISTRATIVE RECORD

in locations where the species was found likely to be exposed to these levels. *See* FWS 00350-52 [BiOp at 335-337]; *see also* FWS 00236 [BiOp Table 4-18 at p. 221]. The additional references Plaintiff proffers are not permissible extra-record evidence because FWS has reviewed the range of impacts of selenium on bull trout; and FWS has found that the water quality standards for selenium will have adverse effects on bull trout, including an impact on reproduction. Plaintiff has failed to show that FWS' record is so bare as to frustrate judicial review of FWS' consideration of the impacts of selenium on bull trout.

C. FWS Addressed the Topics In the 12 Papers Concerning Arsenic.

Plaintiff proffers 12 articles that relate to arsenic. PX 1, PX 2, PX 3, PX 5, PX 6, PX 8, PX 10, PX 12, PX 14, PX 18, PX 19, PX 20. It claims all these articles are relevant to assessing a dietary route of exposure to bull trout and other aquatic species. Pl. Br. 15-20. Four references are abstracts from professional meetings or are summary review papers that do not report the details of the research or do not contain primary research. PX 5, PX 8, PX 12, PX 19. One is a methods testing study that evaluates sediment. PX 2. Two references evaluate sediment concentrations or evaluate a mixture of contaminants and do not report water column concentrations. PX 6, PX 20. The remaining of these Plaintiff's exhibits evaluate the dietary pathway or evaluate reductions in fish prey from arsenic exposure.[11]

---

[11] At the outset, it bears noting that the issue Plaintiff raises about dietary routes of exposure is of questionable relevance to evaluating the effects of water column concentrations of arsenic on bull trout or other aquatic species. While the Oregon BiOp evaluates the dietary pathway for all metals under the "Multiple Routes of Exposure" section, no predictable relationship between the water column and sediment or tissue concentrations could be identified for arsenic. FWS 000179-000193 [BiOp at 164-178]; FWS 000181-000182 [BiOp at 166 to 167]. Even the Idaho BiOp (whose conclusions Plaintiff apparently prefers) states that arsenic in the water column is highly variable and often does not correlate with tissue concentrations, concluding the arsenic dietary toxicity section of that biological opinion by stating that its review "suggests that the

Page 20 of 33: DEFENDANTS' MEMO IN OPPOSITION TO MOTION TO COMPLETE AND SUPPLEMENT THE U.S. FISH AND WILDLFE SERVICE'S ADMINISTRATIVE RECORD

In the Oregon BiOp, FWS did consider that mortality of some sensitive invertebrates that serve as fish prey for bull trout can occur at arsenic concentrations below the chronic water quality criterion under evaluation. The Oregon BiOp qualitatively evaluated the reduction of fish prey, stating for example:

> The presence of toxins within bull trout habitat may present variable direct and indirect threats for bull trout within many locations in Oregon. Depending on the toxin, these effects could range from death or injury, to reduced reproduction potential from disruption of homing abilities for migratory fish. Indirect threats to bull trout associated with decreases in already low numbers of prey species resulting from both direct mortality of the prey species, and habitat changes that reduce the carrying capacity of prey species habitat could occur.

FWS 0063 [ BiOp at 48]. Further discussion in the Oregon BiOp regarding prey items follows in the "Effects to Prey Species" subsection as follows:

> Since we are unable to accurately analyze all possible effects to bull trout prey species, we make the assumption that there may be a reduction in these prey species under some of the proposed standards. This reduction in prey may have adverse effects to bull trout. However, we have no way to quantify those effects.

FWS 00199 [BiOp at 184]. The Oregon BiOp then evaluated the effects from reduced prey from contaminants to bull trout in the critical habitat section of the Oregon BiOp, as follows:

> In all, 11 of the 13 CHUs [critical habitat units] in Oregon, and portions of both the Columbia and Snake Rivers have potential for exposure to the criteria analyzed in this Biological Opinion. PCE [primary constituent element] 3 and PCE 8 will be adversely affected in areas of exposure within these CHUs. Implementation of the proposed action

_____

dissolved arsenic criterion may be less relevant than a sediment, dietary, or tissue residue-based criterion." PX 22, ECF 21-3 at NWEA 00562. However, the water quality standards at issue in this case are dissolved arsenic criteria. Hence, FWS' primary task is to evaluate potential effects to bull trout directly or indirectly caused by water column concentrations at these levels, and secondarily to evaluate if there is a clear relationship between water column concentrations and either tissues or sediment. FWS is not approving any levels of arsenic in sediment or otherwise. Thus, issues regarding sediment, dietary, or tissue-residue toxicity to bull trout are not especially germane unless water column concentrations of arsenic are a causal link in the same exposure pathway.

Page 21 of 33:  DEFENDANTS' MEMO IN OPPOSITION TO MOTION TO COMPLETE AND SUPPLEMENT THE U.S. FISH AND WILDLFE SERVICE'S ADMINISTRATIVE RECORD

will reduce the abundance of prey species for bull trout, and will reduce the ability of individual CHUs to provide water quality conducive to normal reproduction, growth and survival of bull trout.  The degree of these adverse effects varies tremendously by location across the action area (Table 4-2).

FWS 00246-47 [ BiOp at 231-32]; FWS 00238 [BiOp at 223].

FWS noted that "the body of literature we used in developing our models indicates that . . . arsenic [has] the potential to adversely affect the food chain by reducing the number or size of forage fish available to bull trout" and considered information that arsenic was toxic to invertebrates (i.e. prey items of salmonids).  FWS 00245 [BiOp at 230]; FWS 025821-025831 (Spehar et.al., 1980), specifically FWS 025825- 025829; FWS 060479-060487 (Tisler and Zagoric-Koncan 2002), specifically FWS 060483- 060485.  Thus, it cannot be said that FWS ignored the dietary pathway or failed to consider information about reductions in fish prey from arsenic exposure, even despite significant uncertainty in the scientific literature about the relationship or contribution of dissolved arsenic in the water column to prey availability or bioaccumulation.

Moreover, Plaintiff's articles appear to rely on data supplied by studies already in FWS' record.  For example, there is no data reported in the abstract provided in PX 5.  These same authors however published another article earlier in 2011 that covers the same issues, and is already in FWS's record.  FWS 008193-008200 (Erickson et al. 2011).  The Oregon BiOp used this article (Erickson et al. (2011)) as evidence that fish can accumulate arsenic in tissues with increasing water exposures, but primarily when the exposures are well above chronic criterion concentrations.  FWS 000182 [BiOp at 167].  Likewise, PX 12 is a book chapter summarizing research on arsenic and does not provide any original data.  As such, it relies on information regarding adverse effects in whole-body tissue concentrations that duplicate references in the FWS record here, such as Oladimeji et al. 1984.  FWS 020778-020787; FWS 008139-008200

(Erickson et al., 2011), specifically FWS 008197; and FWS 025821-025831 (Spehar et al. 1980), specifically FWS 025825.

FWS has considered the issues pertaining to the dietary route of exposure to bull trout, and the uncertain relationship of the dissolved water concentration of arsenic to those effects. FWS 025821-025831 (Spehar et al. 1980), specifically FWS 025828- 025829; FWS 008139-008200 (Erickson et al., 2011), specifically FWS 008197- 008198. FWS reviewed evidence that the relationship between arsenic concentrations in water and in fish tissue are variable and not easily predicted from studies. FWS 006484- 006494 (DeForest et al., 2007); FWS 020778-020787 (Oladimeji et al., 1984), specifically FWS 020780; and FWS 008139-008200 (Erickson et al., 2011), specifically FWS 008197-008198. The Oregon BiOp ultimately relied on information showing that estimating tissue concentrations from water column concentrations is too variable to incorporate into the effects analysis. FWS 005444-005488 (Clearwater et al., 2002), specifically FWS 005444, 005480, 005486; FWS 007330-007394 (Eisler 1988a), specifically FWS 007345.

Plaintiff's exhibits do not serve to plug any holes in the FWS record for the Oregon BiOp. The current administrative record addresses each of the issues Plaintiff seemingly asserts that FWS ignored. To the limited extent Plaintiff offers any legal argument, its cited caselaw is unpersuasive. It relies on two unreported district court decisions that are both easily distinguishable. Pl. Br. at 12. The first of these is *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, No. CV S-06-2845 LKK/JFM, 2008 WL 11400759, at *11 (E.D. Cal. Dec. 23, 2008). That opinion decided a motion to compel discovery, and did not actually decide whether the extra-record evidence offered there was permissible under applicable precedent. That analysis occurred in a later decision, allowing extra-record consideration of one study because

Page 23 of 33:  DEFENDANTS' MEMO IN OPPOSITION TO MOTION TO COMPLETE AND SUPPLEMENT THE U.S. FISH AND WILDLFE SERVICE'S ADMINISTRATIVE RECORD

the government had not "identified <u>any</u> evidence in the administrative record addressing the above questions regarding global warming." *See S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 723 F. Supp. 2d 1247, 1274 (E.D. Cal. 2010) (emphasis added). However, as discussed *supra*, there <u>is</u> evidence in the administrative record here addressing the toxicity and adverse effects of the three pertinent water quality constituents. Plaintiff's extra-record evidence is not permissible to address the same issues.

Plaintiff also cites (Pl. Br. at 12) *Trout Unlimited v. Lohn*, No. C05-1128C, 2006 WL 1207901, at *4 (W.D. Wash. May 4, 2006). This decision is not persuasive because it fails to cite or apply any of the controlling precedent on consideration of extra-record evidence. Indeed, the decision there ordered completion of the agency record, not extra-record consideration, with a scientific report prepared by the agency itself on the same subject of the agency policy at issue. This is not relevant precedent and provides no support to Plaintiff's motion.

FWS' administrative record has identified the factors that are relevant to FWS' inquiry. FWS explained the factors relevant to the no-jeopardy and no-adverse modification findings, and it explained how it analyzed those factors in reaching its decision. *Jewell*, 747 F.3d at 602 ("The determination of what constitutes the 'best scientific data available' belongs to the agency's special expertise…") (quoting *Balt. Gas & Electric Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983)). The Court should deny Plaintiff's request to supplement the record with these 21 articles, or the 2015 Idaho BiOp.

## IV.    The Claims Against EPA Are Governed By the APA's Standard and Scope of Review And Thus Are Limited To the Administrative Record.

Plaintiff also uses its motion to advance the position that it will not be bound by the administrative record for its ESA citizen suit claims, and intends to offer the 21 articles and Idaho BiOp in litigating its second through fourth claims for relief against EPA. Pl. Br. at 6 n.5,

Page 24 of 33:  DEFENDANTS' MEMO IN OPPOSITION TO MOTION TO COMPLETE AND SUPPLEMENT THE U.S. FISH AND WILDLFE SERVICE'S ADMINISTRATIVE RECORD

13.  In support, Plaintiff cites two Ninth Circuit cases, but ignores abundant and controlling caselaw holding otherwise.  Given the importance of this issue to efficient briefing of summary judgment, and because Plaintiff argued the issue in its opening brief as a reason it seeks relief only against FWS, Defendants respond accordingly and request that the Court limit review of all claims in this case to the agencies' administrative records, without consideration of any extra-record evidence for any claim against either Defendant agency.

More than fifty years ago, in *United States v. Carlo Bianchi & Co.*, 373 U.S. 709 (1963), the Supreme Court confirmed that unless a statute specifies otherwise, a court's review of federal agencies' administrative actions is limited to the "arbitrary and capricious" standard of review provided by the APA and is based on the administrative record.  "[I]n cases where Congress has simply provided for review, without setting forth the standards to be used or the procedures to be followed, this Court has held that consideration is to be confined to the administrative record and that no *de novo* proceeding may be held." *Carlo Bianchi & Co.*, 373 U.S. at 715; *see also Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976) (even when a claim is not brought under the APA, "review of administrative decisions is to be confined to 'consideration of the decision of the agency . . . and of the evidence on which it was based.'" (quoting *Carlo Bianchi & Co.*, 373 U.S. at 714-15)). The Ninth Circuit—as it must—follows this fundamental precept, holding that APA review standards apply unless a statute "expressly" indicates a contrary intent. *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1193-94 (9th Cir. 2000) (citing *Dickinson v. Zurko,* 527 U.S. 150 (1999) and *Chandler v. Roudebush*, 425 U.S. 840, 861-62 (1976) for the proposition that the APA, and not *de novo* review, is the "default judicial review standard" for agency action).

Because the ESA citizen-suit provision, 16 U.S.C. § 1540(g)(1)(A), contains no internal scope or standard of review, "an agency's compliance with the ESA is reviewed under the Administrative Procedure Act." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (*en banc*), *cert. denied sub nom. New 49'ers v. Karuk Tribe*, 133 S. Ct. 1579 (2013); *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011) (same). This has been the settled standard for more than thirty years, as the Ninth Circuit has consistently reviewed ESA citizen-suit cases in accordance with APA record review principles, and continues to do so today. *See Village of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984) ("Because [the] ESA contains no internal standard of review, section 706 of the [APA], 5 U.S.C. § 706, governs review."); *Jewell*, 747 F.3d at 601-02 (applying APA "standards" to ESA claims and limiting review to the administrative record); *NW. Ecosystem All. v. FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007) ("We may not consider information outside of the administrative record" when reviewing ESA citizen-suit claims under the APA standard); *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1086 (9th Cir. 2004); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205-06 (9th Cir. 2004); *Ctr. for Biological Diversity v. Badgley*, 335 F.3d 1097, 1100-01 (9th Cir. 2003) (looking to the "administrative record" when holding that NMFS's decision not to list a species under the ESA "was amply supported by evidence in the record" and was not arbitrary or capricious).[12]

---

[12] Other Circuits agree that ESA citizen-suit claims must be reviewed based on the administrative record. *See, e.g.*, *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 685-86 (D.C. Cir. 1982); *Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010); *Newton Cty. Wildlife Ass'n v. Rogers*, 141 F.3d 803, 808 (8th Cir. 1998); *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002).

Page 26 of 33:  DEFENDANTS' MEMO IN OPPOSITION TO MOTION TO COMPLETE AND SUPPLEMENT THE U.S. FISH AND WILDLFE SERVICE'S ADMINISTRATIVE RECORD

None of these cases have separated the APA's "arbitrary or capricious" standard of review from its inextricably related scope of review. Section 706 of the APA articulates the standard and interrelated scope of review in the same section:

> [STANDARD OF REVIEW:] [T]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . .
>
> [SCOPE OF REVIEW:] *In making the foregoing determinations,* the court shall review the whole record or those parts of it cited by a party . . . .

5 U.S.C. § 706 (emphasis added). This language confirms that the APA's standard and scope of review are indivisible: the Court's task is "to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made," *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983); and, in making these specific determinations, the Court must review the "whole record," meaning the Court's determinations are "to be based on the full administrative record that was before the [agency decision-makers] at the time [they] made [their] decision," *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971). The Supreme Court has explained that the "arbitrary and capricious" standard of review "ha[s] frequently been used by Congress and ha[s] consistently been associated with a review limited to the administrative record." *Carlo Bianchi & Co.*, 373 U.S. at 715. Indeed, the Supreme Court has recognized that limiting judicial review to the administrative record is necessary to prevent courts from exercising sweeping *de novo* review of agency action. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 549 (1978). The Ninth Circuit has likewise regularly confirmed that, in order to maintain the proper deference to agency decision-making and avoid *de novo* review, the governing standard of

Page 27 of 33:  DEFENDANTS' MEMO IN OPPOSITION TO MOTION TO COMPLETE AND SUPPLEMENT THE U.S. FISH AND WILDLFE SERVICE'S ADMINISTRATIVE RECORD

review must not be severed from the scope of review.  *Lands Council*, 395 F.3d at 1030; *Asarco*, 616 F.2d at 1160; *Jewell*, 747 F.3d at 602.

Plaintiff cites *Washington Toxics Coalition v. EPA*, 413 F.3d 1024 (9th Cir. 2005)*,* and *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011), as support for this significant reversal in Ninth Circuit caselaw.  Pl. Br. at 6 n.5, 13.  But the notion that *Washington Toxics* or *Kraayenbrink* overruled decades of unbroken Ninth Circuit precedent on a basic question of administrative law about judicial review of agency action, created a new Circuit split, and contravened the Supreme Court—all without any discussion whatsoever—is not possible. *See In re Osborne*, 76 F.3d 306, 309 (9th Cir. 1996) ("[A] panel of this court may not overrule a decision of a previous panel; only a court *in banc* has such authority."). Rather, *stare decisis* requires the Court to read *Washington Toxics* and *Kraayenbrink* against: (i) bedrock Supreme Court precedent that confines judicial review to the administrative record where a citizen-suit provision does not set forth specific standards to be used; and (ii) thirty years of case law confining review of ESA citizen-suit claims to the record. *See, e.g.*, *United States v. Home Concrete & Supply, LLC*, 132 S. Ct. 1836, 1844 (2012) (*stare decisis* has special force in cases of statutory interpretation).

In *Washington Toxics*, the Ninth Circuit never directly opined on whether ESA citizen-suit cases are reviewed based upon an administrative record. Instead, it held that "suits to compel agencies to comply with the substantive provisions of the ESA arise under the ESA citizen-suit provision, and not the APA" and therefore are not subject to the APA's "limited provision for judicial review of final agency action." 413 F.3d at 1034 (citing 5 U.S.C. § 704, which limits APA review to final agency action). To the extent that Plaintiff interprets this paragraph in *Washington Toxics* as holding that *none* of the APA review standards apply to ESA cases, it not

only contradicts past Supreme Court and Ninth Circuit cases without any explanation, but has been abrogated by subsequent Supreme Court precedent.

In *National Ass'n of Home Builders v. Defenders of Wildlife*, the Supreme Court evaluated whether the EPA had complied with ESA Section 7(a)(2) in declining any obligation to consult, and unambiguously imported the APA review standards into its ESA evaluation. 551 U.S. 644, 659 (2007) ("The federal courts ordinarily are empowered to review only an agency's final action, *see* 5 U.S.C. § 704"); *see also id.* at 657 (applying the APA's "arbitrary and capricious" standard of review to an EPA permitting decision); *id.* at 658 (suggesting the appropriate APA remedy would have been to remand to the agency); *id.* (recognizing the APA's harmless error rule under 5 U.S.C. § 706). This instruction from the Supreme Court leaves no doubt that claims challenging an action agency's compliance with the ESA must comply with APA standards, and any contrary holding in *Washington Toxics* is no longer good law.

In *Kraayenbrink*, the panel cited only *Washington Toxics* to support its conclusion that limited extra-record evidence could be considered in that case. 632 F.3d at 497. Importantly, in *Kraayenbrink*, both the Ninth Circuit and the district court reviewed an administrative record, which they then supplemented with limited "extra-record" material. *Id.* at 497; *W. Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302, 1322-23 (D. Idaho 2008) ("[T]he material cited above by the Court is all within the Administrative Record and was before the BLM when it made its decision not to consult. Examining only this Administrative Record material under the broad definition of 'may affect,' the Court finds that the BLM's failure to consult was arbitrary and capricious."). The Ninth Circuit characterized the extra-record materials as "relevant expert analysis" from "agency experts," including state and federal employees, that "the [Bureau of Land Management] failed to consider." *Kraayenbrink*, 632 F.3d at 498. The admission of such

evidence appears to be consistent with the ordinary APA rule allowing for limited supplementation of the record where the proffered extra-record evidence is necessary to identify specific issues the agency may have ignored. *See Lands Council*, 395 F.3d at 1030. Under this interpretation, *Kraayenbrink* does not silently overrule 30 years of Ninth Circuit precedent that it does not even cite, create a Circuit split, nor contravene the Supreme Court.

When viewed in this proper light, it is clear that *Washington Toxics* and *Kraayenbrink* are "limited in scope" to established principles of administrative law, not radical departures from them. *Sierra Club v. McLerran*, No. C11-1759RSL, 2012 WL 5449681, at *2 (W.D. Wash. Nov. 6, 2012). In fact, the Ninth Circuit merely "ratified the district courts' use of discretion . . . to supplement the record" under the pre-existing narrow exceptions to record review, a "far cry" from authorizing district courts to "engage in *de novo* review," or rendering "the APA's standards an inapt guideline." *Id.*; *see also WildEarth Guardians v. U.S. Forest Serv.*, No. CV-10-00385-TUC-DCB, 2011 WL 11717437, at *1 (D. Ariz. Apr. 26, 2011) (rejecting plaintiff's effort to introduce extra-record evidence and conduct discovery under ESA citizen-suit provision based on supposed "new standard announced in *Kraayenbrink*"). In other words, these cases did not announce the wholesale (and unexplained) abandonment of administrative review principles for ESA citizen-suit claims.

Finally, whatever confusion *Washington Toxics* and *Kraayenbrink* sowed, the *en banc* Ninth Circuit has definitively dispelled by holding that a failure to consult claim raised under the ESA citizen-suit provision "is reviewed under the Administrative Procedure Act" and "is a record review case." *Karuk Tribe of Cal.*, 681 F.3d at 1017. In that case, the Ninth Circuit evaluated the parties' summary judgment motions "based upon [its] review of the administrative record." *Id. Karuk Tribe* was an *en banc* decision and therefore provides the controlling law of

the circuit even if it contradicts prior panel decisions, such as *Kraayenbrink* and *Washington Toxics*. *United States v. Easterday*, 564 F.3d 1004, 1010 (9th Cir. 2008) ("[A] panel opinion is binding on subsequent panels unless and until overruled by an en banc decision of this circuit."); *Barapind v. Enomoto*, 400 F.3d 744, 751 n.8 (9th Cir. 2005) (an *en banc* decision "effectively overrule[s]" any prior circuit authority if the reasoning or theory is "clearly irreconcilable," regardless of whether the *en banc* court directly cites the prior authority).

Indeed, in subsequent decisions the Ninth Circuit has again confirmed that ESA claims are reviewed under the APA standard and that such review "is limited to the administrative record already in existence, not some new record made initially in the reviewing court." *Jewell*, 747 F.3d at 602 (citations and quotations omitted); *see also Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 674 (9th Cir. 2016) ("We hold that on the basis of the administrative record, NMFS's listing decision is reasonable."); *Bldg. Indus. Ass'n of the Bay Area v. U.S. Dep't of Commerce*, 792 F.3d 1027, 1032, 1034 (9th Cir. 2015) (reviewing ESA claims on the administrative record). *Jewell* also warned that "[t]here is a danger when a reviewing court goes beyond the record" in an ESA case and reiterated that considering extra-record evidence "inevitably leads the reviewing court to substitute its judgment for that of the agency." 747 F.3d at 602 (citations omitted). Were Plaintiff correct, the court in *Jewell* would have had to separately consider the voluminous extra-record evidence when reviewing the ESA citizen suit claim that the action agency Bureau of Reclamation acted arbitrarily and capriciously when it accepted the BiOps at issue. *Jewell*, 747 F.3d at 640; *see also Locke*, 776 F.3d at 1009 (same). Neither decision found it appropriate to consider the extra-record evidence in deciding claims essentially identical to Plaintiff's second claim for relief in this case.

In short, neither *Washington Toxics* nor *Kraayenbrink* could have toppled well-established APA record review principles that the Supreme Court and Ninth Circuit have applied to ESA citizen suit cases for decades.  Plaintiff's position on the scope of review for its claims against EPA lacks merit and does not justify any disregard of the record review rules discussed *supra*.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's Motion to Complete and Supplement the U.S. Fish and Wildlife Service's Administrative Record and order that Plaintiff may not rely on extra-record evidence in arguing any of its four claims for relief.

Respectfully submitted this 3rd day of July, 2019,

JEAN E. WILLIAMS
Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ John H. Martin*
JOHN H. MARTIN
Wildlife & Marine Resources Section
999 18th St., South Terrace Suite 370
Denver, CO 80202
john.h.martin@usdoj.gov
Telephone (303) 844-1383
Facsimile (303) 844-1350

Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2019, a true and correct copy of the above document was electronically filed with the Clerk of Court using CM/ECF. Copies of the document will be served upon interested counsel via the Notices of Electronic Filing that are generated by CM/ECF.

*/s/ John H. Martin*
JOHN H. MARTIN