JAMES N. SAUL, OSB No. 152809
ALLISON LAPLANTE, OSB No. 023614
LIA COMERFORD, OSB No. 141513
Earthrise Law Center
at Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219-7799
(503) 768-6929, jsaul@lclark.edu
(503) 768-6894, laplante@lclark.edu
(503) 768-6823, comerfordl@lclark.edu

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES, a non-profit organization,<br><br>                    Plaintiff,<br><br>    v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE, a United States Government Agency; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, a United States Government Agency,<br><br>                    Defendants. | Case No: 3:18-cv-01420<br><br>**PLAINTIFF'S COMBINED REPLY TO ITS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

    I.    The Oregon BiOp is Arbitrary, Capricious, and Contrary to Both the Endangered Species Act and the Clean Water Act ....................................................... 2

        A.  FWS Arbitrarily Relied on Uncertain Modeling to the Exclusion of Other Relevant Data and Information ................................................................. 2

        B.  FWS Arbitrarily Relied on Surrogate Bluegill Data ............................................... 4

        C.  FWS Arbitrarily Limited its Review to Bull Trout Habitat Waters Presently Known to have Clean Water Act Permitted Sources of Toxics .............. 6

        D.  FWS' Conclusions Regarding Bull Trout Avoidance Behaviors in the Columbia and Snake Rivers was Arbitrary ............................................................ 9

        E.  FWS Failed to Fully Consider Impacts to Bull Trout Recovery .......................... 10

    II.   EPA Violated the Endangered Species Act by Failing to Reinitiate Consultation Based Upon New Information ........................................................... 13

CONCLUSION ....................................................................................................................... 16

## TABLE OF AUTHORITIES

**Federal Cases**                                                                                           **Page**

*Cal. Sportfishing Prot. All. v. Fed. Energy Reg. Comm'n*,
   472 F.3d 593 (9th Cir. 2006) ....................................................................................... 14

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
   No. CV-20-00020-TUC-DCB, 2020 WL 6710944 (D. Ariz. Nov. 16, 2020) ................. 14

*Coleman v. Quaker Oats Co.*,
   232 F.3d 1271 (9th Cir. 2000) ....................................................................................... 10

*Concerned Friends of the Winema v. U.S. Forest Serv.*,
   No. 1:14-CV-737-CL, 2016 WL 10637010 (D. Or. Sept. 12, 2016) ............................... 10

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
   789 F.3d 1075 (9th Cir. 2015) ................................................................................. 13, 14

*Humane Soc. of U.S. v. Locke*,
   626 F.3d 1040 (9th Cir. 2010) ......................................................................................... 3

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   184 F. Supp. 3d 861 (D. Or. 2016) .................................................................................. 3

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   524 F.3d 917 (9th Cir. 2008) ......................................................................................... 11

*Nat. Res. Def. Council v. Rodgers*,
   381 F. Supp. 2d 1212 (E.D. Cal. 2005) ......................................................................... 15

*Nw. Envtl. Advocates v. U.S. Envtl. Protection Agency*,
   No. 3:12-CV-01751-AC, 2018 WL 6524161 (D. Or. Dec. 12, 2018) .............................. 8

*Nw. Envtl. Advocates v. U.S. Envtl. Protection Agency*,
   855 F. Supp. 2d 1199 (D. Or. 2012) ................................................................................ 9

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Engineers*,
   No. 3:18-CV-00437-HZ, 2020 WL 4756323 (D. Or. Aug. 17, 2020) ............................ 10

*Norton v. So. Utah Wilderness All.*,
   542 U.S. 55 (2004) ......................................................................................................... 13

*Nguyen v. United States*,
   792 F.2d 1500 (9th Cir. 1986) ....................................................................................... 10

*Pac. Coast Fed'n of Fishermen's Assns. v. Gutierrez,*
    606 F. Supp. 2d 1122 (E.D. Cal. 2008) ................................................................. 10

*Pronsolino v. Nastri,*
    291 F.3d 1123 (9th Cir. 2002) .................................................................................. 8

*Wasco Prods., Inc. v. Southwall Technologies,*
    435 F.3d 989 (9th Cir. 2006) .................................................................................. 10

*Wild Fish Conservancy v. Salazar,*
    628 F.3d 513 (9th Cir. 2010) ............................................................................ passim


**Statutes and Regulations**                                                                                           **Page**

33 U.S.C. § 1251(b) ..................................................................................................... 15

33 U.S.C. § 1313 .......................................................................................................... 15

33 U.S.C. § 1313(a)–(c) ................................................................................................. 8

50 C.F.R. Part 402 ....................................................................................................... 14

50 C.F.R. § 402.02 .................................................................................................. 7, 11

50 C.F.R. § 402.16 ...................................................................................................... 13

50 C.F.R. § 402.16(a) ............................................................................................ 13, 14

50 C.F.R. § 402.16(a)(2) ....................................................................................... 15, 16


**Other Authorities**                                                                                                    **Page**

84 Fed. Reg. 45,017 (Aug. 27, 2019) .......................................................................... 14

66 Fed. Reg. 11,201 (Feb. 22, 2001) ........................................................................... 15

# INTRODUCTION

Bull trout, a threatened species protected by the Endangered Species Act, faces immense risk to its survival and recovery due to threats throughout Oregon and beyond, including from toxic water pollution from a variety of natural and anthropogenic sources. Plaintiff Northwest Environmental Advocates ("NWEA") argues in its motion for summary judgment that a 2012 Biological Opinion ("Oregon BiOp") issued by the Fish and Wildlife Service ("FWS) is arbitrary and capricious because it failed to fully assess the impacts to bull trout from the Environmental Protection Agency's ("EPA") approval of a host of water quality criteria for toxic pollutants adopted by the State of Oregon under the Clean Water Act. In response, Defendants have argued that the Court should defer to the various analytical choices reflected in the Oregon BiOp, notwithstanding the contrary analytical approach and conclusions of the closely related 2015 Biological Opinion issued by FWS for identical water quality criteria in Idaho ("Idaho BiOp").

Defendants ultimately fail to rationally explain why, in the Oregon BiOp, FWS relied almost exclusively upon statistical toxicology models derived from laboratory experiments and ignored other relevant scientific information it later considered in Idaho in making a "jeopardy" determination. Defendants also fail to justify their unsupported assumptions that artificially limited their toxics exposure analysis to waters with known point sources of pollution and excluded large rivers based on a non-existent avoidance behavior. For these and other reasons, FWS' Oregon BiOp should be set aside as arbitrary, capricious, and contrary to law, and EPA's own violations of the requirements of Section 7 of the Endangered Species Act should be reversed.

# ARGUMENT

I. **The Oregon BiOp is Arbitrary, Capricious, and Contrary to Both the Endangered Species Act and the Clean Water Act**

FWS defends its Oregon BiOp on the grounds that its choice to rely on modeling of direct water exposure effects, while excluding the studies and information it considered later in Idaho about alternate paths of exposure to bull trout, is owed deference. FWS cannot justify its decision here, where it drew unsupported conclusion from the model results and ignored what itself found in Idaho to be the best available information.

    A. **FWS Arbitrarily Relied on Uncertain Modeling to the Exclusion of Other Relevant Data and Information**

As NWEA explained in its opening brief, both EPA in its Biological Evaluation and FWS in its Oregon BiOp relied almost exclusively on a modeling approach that is built around lab studies of the direct, waterborne exposure of various fish species (typically the fathead minnow) on single toxic pollutants. NWEA's Opening Br. at 11–14. Defendants maintain that FWS' choice of models was reasonable and that its use of those models followed "scientifically accepted procedures and practices" and thus the agency is entitled to deference. Defs' Br. at 7–9. Defendants miss the point of NWEA's argument: FWS did not err by choosing to use statistical models in the Oregon BiOp at all; it erred by using *only* those models, to the exclusion of other available data and information, and by making unfounded assumptions that cannot be sustained based on the modeled results.

FWS acknowledged, then dismissed out of hand, the unreliability and limitations of the toxicity data and the chosen modelling while excluding available studies relevant to bull trout for reasons such as time constraints and lack of resources. FWS000481, 000488, 000508–09. Merely disclosing uncertainty and assumptions is not enough where limited and uncertain models inform

the substance of the BiOp. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 899 (D. Or. 2016) ("Although agency determinations are entitled to deference, an agency must articulate a satisfactory explanation for its conclusions and even when an agency's decision relies on scientific expertise, it can be rebutted if it is not reasoned").

Regardless of established practice and procedures related to statistical modelling, FWS did not reasonably explain its choice to rely almost exclusively on such data. The agency believes that the inconsistent ICE modeling results in the Idaho BiOp indicate only that professional judgment is required. Defs' Br. at 10. On the contrary, the review of the ICE model in the Idaho BiOP indicates the unreliability of that model as used by FWS in Oregon, and underscores the unreasonableness of using such modelling exclusively when other information about bull trout impacts from toxics are available. NWEA000541-542. Additionally, the overall inadequacies of the modelling used in the BiOp combined with the findings in the Idaho BiOP favor including other studies and information above and beyond statistical modelling.[1]

The limitations of the ICE model exist regardless of which "version" of the model the FWS uses, contrary to Defendants' argument. Defs' Br. at 10.[2] The updated version of the ICE model was used by FWS to predict acute toxicity values for listed species. While FWS claims that the updated ICE model uses strict standardization criteria for test methods and conditions,

---

[1] FWS' post-hoc attempt to explain away the differences between the methodologies used and conclusions reached in the Oregon and the Idaho BiOps (EPA019896–EPA019901, cited repeatedly by Defendants at pages 6, 27, 28, and 32 of their brief) post-dates the filing of the complaint in this action, and should be ignored. *See Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1050 (9th Cir. 2010) (refusing to consider the agency's post-hoc explanations for its ESA decision, which "serve only to underscore the absence of an adequate explanation in the administrative record itself.")

[2] Defendants' record citation, FWS023019, only serves to emphasize that uncertainty in ICE model results increases "with larger taxonomic distance between the surrogate and predicted species" and that their use "in wildlife risk assessment has not been widely accepted."

PLAINTIFF'S COMBINED REPLY AND OPPOSITION TO DEFENDANTS'        3
CROSS-MOTION FOR SUMMARY JUDGMENT

the accuracy of the model still relies heavily on taxonomic relatedness of the surrogate and listed species. FWS000490. Additionally, the chemical mode of action is a critical component in toxicity estimation of which the updated ICE model does not use, and FWS admits that acute data extrapolation is the greatest source of uncertainty in ecological risk assessment. FWS000481, FWS000490. These inherent limitations on the efficacy of the ICE model preclude its use as the sole basis for a jeopardy decision, as FWS itself recognized in the Idaho BiOp. NWEA000441, 000553.

FWS also attempts to downplay its near-exclusive reliance on the three statistical models discussed in Appendix 1 to the Oregon BiOp, suggesting that it "considered multiple lines of evidence" in a "technical, robust, and complex" methodology. FWS Br. at 7. Yet except for the modeling approach used to determine direct exposure effects discussed in NWEA's opening brief at 11–15, FWS' purported "analysis" of indirect effects was cursory at best, typically involving a page of generic, conclusory statements about potential effect of the toxics on species *other than* bull trout. *See, e.g.*, FWS000181–182 (arsenic); FWS000189–190 (selenium); FWS000230–231 (zinc). The ESA requires more than mere lip service, and here FWS' over-reliance on modeling was arbitrary and capricious.

    **B.**    **FWS Arbitrarily Relied on Surrogate Bluegill Data**

Defendants next argue that the surrogate selection rules applied in the chronic level of effect model allow the use of bluegill as a surrogate species for bull trout. The government states this is because the model's data quality rules prefer using data on surrogate species within the same family as the listed species "*over other surrogate species further apart in taxonomic rank*." Defs' Br. at 17 (emphasis added). However, this reading misrepresents the rule which does not include a reference to other species further away in taxonomic rank. Rather, the rule emphasizes

the preference to use surrogate species within the same family when interpreting regression results from the model (or to consider life history similarities as a possible surrogate selection tool). FWS506. By using bluegill data for growth and survival evaluation of bull trout, FWS deviated from its own rule. Model results using data from a distant taxonomic species should not be the sole basis of the assessment of chronic arsenic effects on bull trout.

Additionally, the Government claims that the rules cover other issues which discourage the use of field tests because real world exposure would confound any results. Def. Br. 17. It is not clear from the rules that the use of field tests is discouraged. It is worth repeating that FWS acknowledged that reviewing field studies could prove helpful to risk assessment and that laboratory studies do not capture complex natural conditions. FWS-000481. Single pollutant tests under sterile laboratory conditions do not account for the potential of multiple pathways of exposure from multiple pollutants and should not be the basis of the chronic arsenic effect analysis. Failing to analyze relevant studies which happen to undermine the reliability of laboratory data, such as those discussed in Pl. Br. 16-17, favors a no jeopardy determination.

Further, it is stated that FWS had a rational basis for selecting bluegill as a surrogate and reasonably addressed the uncertainty of that selection. Def. Br. 18-20. The choice to use blue gill as a surrogate should not be viewed in isolation. NWEA does not ignore that rainbow trout was used as a surrogate to inform the ICE model and derive acute toxicity data for bull trout. However, as discussed above, the ICE model is unreliable and a great source of uncertainty. This questionable component was then used along with blue gill data for growth and survival evaluations in the chronic effect model. The study cited at Pl. Br. 16, is relevant to the use of blue gill in the chronic effect model in that it criticizes the use of surrogates in extrapolations with respect to salmonids and explains the lack of credibility in using life history as a surrogate

selection tool. Generally, FWS did not substantively incorporate into its analyses studies which called in to question their reliance on laboratory data and quantitative models. As a whole, the chronic level of effect model relies on uncertain acute toxicity data and a surrogate species which is too taxonomically distant according to FWS data quality rules.

Rather ironically, FWS argues elsewhere in its brief that "actual information, where it is available, is preferred over blanket assumptions." FWS Br. at 21. But here FWS *ignored* the "actual information" that was available to it, instead choosing to blindly follow EPA's preferred model-based "ecological risk assessment paradigm" that FWS concedes "has areas of scientific uncertainty and relies on unproven assumptions to make risk determinations, especially in evaluations of listed species where toxicity data are sparse." FWS000178.

Further, FWS now suggests, without record citation, that its revised approach as reflected in the Oregon BiOp "hew[s] more closely to accepted ecological risk assessment principles." FWS Br. at 21, n.18. Yet FWS' own description of its methodology recognizes that it ignored relevant field studies that could have "provide[d] additional information for risk assessment," FWS000481; depended heavily on data extrapolated from laboratory studies of unrelated surrogate species which introduced "uncertainty and variability associated with these extrapolations," FWS000487; and relied on EPA's generic safety factor which "may introduce additional uncertainty to the consultation[.]" FWS000488. Lack of time or resources was the agency's stated reason for each of these shortcuts. *Id*.

C. **FWS Arbitrarily Limited its Review to Bull Trout Habitat Waters Presently Known to have Clean Water Act Permitted Sources of Toxics**

As the Ninth Circuit has noted, the "delineation of the scope of an action can have a determinative effect on the ability of a biological opinion fully to describe the impact of the action on the viability of the threatened species[.]" *Wild Fish Conservancy v. Salazar*, 628 F.3d

PLAINTIFF'S COMBINED REPLY AND OPPOSITION TO DEFENDANTS'  6
CROSS-MOTION FOR SUMMARY JUDGMENT

513, 522 (9th Cir. 2010). Accordingly, FWS' Idaho BiOP correctly examined the state-wide effects of the toxics criteria approval, noting that the EPA-approved criteria "will be applied statewide without deference to species' ranges," and that "the purpose of the consultation is to evaluate the protectiveness of the criteria." Idaho BiOp at NWEA-000539. By contrast, in the Oregon BiOp FWS expressly limited its exposure analysis to bull trout habitat waters known to the agency to receive toxics from two categories of sources: NPDES-permitted point sources and mining operations. FWS-000195. As a result, only those "known potential sources that could specifically be identified that lay within 2 miles of bull trout habitat were included in the analysis[.]" FWS000148. The Idaho analysis was proper; the narrower analysis used in Oregon was unlawful.

FWS defends its approach in Oregon by claiming that it undertook the correct "causation analysis and utilized the best available scientific and commercial information." FWS Br. at 20. FWS does not dispute that the "action" under review was the approval of state-wide water quality criteria, or that the "action area" is the entire State of Oregon. FWS Br. at 21–22 (citing the regulatory definitions of those terms at 40 C.F.R. § 402.02). Rather, it relies on a technocratic discussion of the difference between the ESA terms of art "action area" and "effects of the action" that wholly ignores the function of water quality criteria under the Clean Water Act. FWS Br. at 22. FWS' arguments are unavailing.

Contrary to FWS' argument, the foreseeable "effects of the action" undertaken by EPA is the presence of toxic pollutants in Oregon's rivers and streams at the criteria concentrations approved by EPA. *See* FWS031936–937 (EPA's Biological Assessment noting that "the effect analysis . . . examines the effects to listed species of the standards themselves assuming they are attained."). Furthermore, the adoption of state-wide water quality criteria and the effects of those

criteria on ESA-listed species is not dependent upon the existence of known "anthropogenic sources" of the pollutants at issue, as FWS suggests. FWS Br. at 21. To the contrary, "[w]ater quality standards reflect a state's designated *uses* for a water body and do not depend in any way upon the source of pollution." *Pronsolino v. Nastri*, 291 F.3d 1123, 1137 (9th Cir. 2002) (citing 33 U.S.C. § 1313(a)–(c)). Water quality criteria serve as targets for each water, and they apply and must be attained even when only nonpoint (e.g. diffuse) sources or natural inputs of a pollutant exist in a watershed. *See Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, No. 3:12-CV-01751-AC, 2018 WL 6524161, at *4 (D. Or. Dec. 12, 2018) (a purpose of the Clean Water Act is "not merely to set a cap on anthropogenic sources of pollution in a vacuum" but to "bring waters into compliance with the applicable criteria."). Accordingly, the only rational methodology for assessing the potential impacts to ESA-listed species of new state-wide water quality criteria is to "evaluate the protectiveness of the criteria . . . applied statewide without deference to species' ranges" or the potential sources of pollutants under review. Idaho BiOp at NWEA-000539.

Finally, FWS' contention that it undertook a "comprehensive analysis" of the "future point and nonpoint discharges of each chemical" is flat-out wrong. FWS Br. at 24. At best, FWS made a passing reference to—and immediately dismissed out of hand—the potential for exposure of bull trout to various toxic pollutants due to forestry practices, agricultural activities, and other such nonpoint sources, FWS000147, and the Oregon BiOp concedes that *only* those "known potential sources that could specifically be identified that lay within 2 miles of bull trout habitat were included in the analysis[.]" FWS000148. No other record evidence supports FWS' suggestion that it looked to anything other than two categories of known and existing sources: current NPDES-permitted facilities and metal mines. *See* FWS000148-149 (categorizing miles of

bull trout habitat "exposed" by metal mines and current NPDES permits). Merely identifying "cumulative impacts without further analysis was arbitrary and capricious." *Nw. Envtl. Advocates v. U.S. Envtl. Protection Agency*, 855 F. Supp. 2d 1199, 1226 (D. Or. 2012). Accordingly, the Court should remand the Oregon BiOp so that FWS can "conduct a thorough cumulative effects analysis that actually analyzes how the new water quality standards would [a]ffect the listed species in combination with other activities having an effect on the species." *Id*.

> **D.     FWS' Conclusions Regarding Bull Trout Avoidance Behaviors in the Columbia and Snake Rivers was Arbitrary**

There is no doubt that bull trout prefer cold water and that ideal incubation and rearing temperatures are low. *See* FWS000045. Even so, FWS recognizes that "occasionally these fish are found in larger, warmer river systems throughout the Columbia River basin[.]" *Id.* FWS defends its conclusion that exposure to chronic concentrations of toxic pollutants in in the mainstem Columbia and Snake rivers is "not likely to cause additional death or injury of affected bull trout" as grounded in its "professional judgment" about bull trout life history and the potential concentrations of toxics in those rivers under low flow conditions. Def's Br. at 24. But FWS' conclusory assumptions lack support in the record.

At bottom, FWS' arguments are based entirely on the impact of flow and temperature on bull trout habitat, Def's Br. at 24–25, and have nothing to do with the BiOp's conclusion that bull trout can "move through or avoid the highest concentrations of" the pollutants they may encounter within large rivers like the Columbia and Snake. FWS000205. The agency points to no record support for that supposed avoidance behavior, nor is there any record basis for FWS' admitted "inference" that toxic pollutants "would tend to be most concentrated" during low flow

summer months. Def's Br. at 25. Even if there was, it would be irrelevant to an effects analysis intended to assess the protectiveness of the criteria themselves.

A BiOp's conclusions based upon unfounded assumptions, speculation, or surmise are by definition arbitrary and capricious. *Concerned Friends of the Winema v. U.S. Forest Serv.*, No. 1:14-CV-737-CL, 2016 WL 10637010, at *12 (D. Or. Sept. 12, 2016); *Pac. Coast Fed'n of Fishermen's Assns. v. Gutierrez*, 606 F. Supp. 2d 1122, 1184 (E.D. Cal. 2008). Here, FWS lacks record support for its "inferences" regarding exposure of bull trout to toxics in the mainstem Columbia and Snake Rivers, and accordingly its conclusions in the BiOp must be reversed.

**E.    FWS Failed to Fully Consider Impacts to Bull Trout Recovery**

At the outset, NWEA's argument regarding the Oregon BiOp's failure to adequately consider bull trout recovery is not a separate "claim" as Defendants suggest, Defs' Br. at 25; it is merely a line of argument under NWEA's "arbitrary and capricious" claim, pled in the complaint. Defendants' two cited cases are not APA cases, and are thus immaterial here. Defs' Br. at 25 (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292-93 (9th Cir. 2000) and *Wasco Prods., Inc. v. Southwall Techs.*, 435 F.3d 989, 992 (9th Cir. 2006)). It makes no sense to apply those precedents in record-review cases where there is no discovery, no basis for the parties to develop their own evidence to defend particular theories of liability, and thus no potential for prejudice to the Defendants.[3] *See Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Engineers*, No. 3:18-CV-00437-HZ, 2020 WL 4756323, at *11 (D. Or. Aug. 17, 2020) (agency

---

[3] If the Court determines that NWEA failed to plead its argument that the Oregon BiOp is arbitrary and capricious for the additional reason that it fails to adequately consider bull trout recovery, NWEA will seek leave to amend its complaint accordingly. *See* Fed. R. Civ. P. 15(a); *Nguyen v. United States*, 792 F.2d 1500, 1503 (9th Cir. 1986) (noting that leave to amend should be freely given, even after the summary judgment stage, where there is no prejudice).

was "not prejudiced by reaching the merits of the claim" where it had the opportunity to address that claim at the summary judgment stage).

On the merits, FWS' various citations to the Oregon BiOp fail to identify any meaningful consideration of bull trout *recovery*, as distinct from survival. Defs' Br. at 26. The BiOp pages referenced by the agency merely repeat the same conclusory language for each core area that pertains to survival of the species, and make no specific mention of recovery specifically:

> Sufficient numbers of bull trout are likely to survive (under the worst case scenario used in our analysis) to refound any affected areas, and support a persistent population of the bull trout in this basin. In addition, it is unlikely that the exposure of any of the contaminants would be widespread and occur simultaneously.

FWS000357-364 (cited at Def's Br. at 26). Recovery, by definition, requires more than mere survival: "Recovery means improvement in the status of listed species to the point at which listing is no longer appropriate under" the ESA. 50 C.F.R. § 402.02. As the Ninth Circuit has found, collapsing the "survival" and the "recovery" elements into a single analysis circumvents the ESA's clear language: under such an approach, "if there is no appreciable reduction of survival odds, there can never be jeopardy, even if recovery is completely impossible." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 931 (9th Cir. 2008); *see also Wild Fish Conservancy*, 628 F.3d at 527 ("Moreover, even before a population is extinguished, it may reach a point at which it is no longer recoverable[.]").

Furthermore, FWS' BiOp language is internally inconsistent: how are bull trout likely to "refound any affected areas, and support a persistent population of the bull trout in this basin" when populations are already declining and up to 40% of bull trout in Oregon will be killed every three years as a result of Oregon's toxics criteria alone? The Oregon BiOp has little discussion of the trends in Oregon's bull trout population, but FWS notes that the current abundance of bull trout in the Klamath River IRU are "greatly reduced from historical levels"

and that bull trout populations there "face a high risk of extirpation." FWS000047. Bull trout in the Columbia River IRU have "declined in overall range and numbers of fish" and presently occur "in 45% of the estimated historical range," with "numerous local extirpations reported throughout the Columbia River basin." FWS000047–048. Population trends are noted as "stable" or "declining" in most critical habitat units within Oregon, with an estimated state-wide population of 4,600 –13,200. FWS000060–061. And even though FWS artificially limited its effects analysis as described above, it *still* found that nearly 2,000 bull trout in Oregon will be killed *every three years* due to acute or chronic exposure to various toxic metals under review. FWS000235–236.[4] Bull trout deaths are projected to occur in every river basin considered by FWS. *Id*. Thus under FWS' own analysis—deeply flawed that it is—and considering only deaths resulting directly from acute or chronic exposure to Oregon's toxics water quality criteria, bull trout will likely be extirpated from most Oregon habitat waters within a decade.

In the face of FWS' own data, therefore, the agency's passing reference to a "continued recovery function" does not pass muster under the ESA. Def's Br. at 26. It is incumbent upon the agency to "articulate a rational connection between the facts found and the conclusions made" in its BiOp. *Wild Fish Conservancy*, 628 F.3d at 529.[5] It failed to do so in the Oregon BiOp, and that BiOp must be remanded for further analysis of bull trout recovery.

---

[4] In Tables 4–17 and 4–18, FWS summarizes the cumulative adverse effects on bull trout due to acute or chronic exposure to aluminum, ammonia, arsenic, cadmium, chromium III, copper, lead, nickel, selenium, silver, and zinc.

[5] In *Wild Fish Conservancy*, the Ninth Circuit held that FWS' conclusion in a 2008 BiOp that the "current distribution and abundance of the bull trout in the action area is not likely to change" and that "the proposed action is not likely to appreciably reduce the likelihood of both the survival and recovery of the bull trout in the wild" simply could not be squared with the agency's own finding that the number of bull trout in the action area "would continue to decrease over the action period." 628 F.3d at 526–27.

## II. EPA Violated the Endangered Species Act by Failing to Reinitiate Consultation Based Upon New Information

As FWS itself admitted in the Oregon BiOp, EPA

> may need to reinitiate this consultation if the underlying assumptions about the likely exposure of listed species or critical habitats to the pollutants at issue herein change in the future based on new information and subsequent exposure of certain species (or portions of the range of a particular species) or critical habitats to pollutants covered under the proposed action is then considered likely or known to occur.

FWS000029. In their brief, however, Defendants now argue that reinitiation of consultation is *never* required under 50 C.F.R. § 402.16 for EPA approval of state water quality standards because the agency lacks sufficient discretionary involvement over those standards once they are in place. Defs' Br. at 29–31. Defendants' arguments are wrong, as they misapply Ninth Circuit case law and misconstrue EPA's continuing obligations under the Clean Water Act.

At the outset, contrary to Defendants' contention, the Supreme Court's decision in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ("*SUWA*") is not the controlling law on this issue. As the Ninth Circuit correctly held, *SUWA* was not an ESA case but a case under the National Environmental Policy Act ("NEPA"), and as such it does not implicate the ESA reinitiation regulation at 50 C.F.R. § 402.16. *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1085–86 (9th Cir. 2015). In *Cottonwood*, the Ninth Circuit held that by analogizing to SUWA, the government had "ignore[d] a key difference between NEPA and the regulations governing reinitiation of consultation under the ESA" and that unlike NEPA review, "an agency's responsibility to reinitiate consultation does not terminate when the underlying action is complete." *Id*. The "determinative question," according to the Ninth Circuit, is whether "discretionary Federal involvement or control . . . has been retained or is authorized by law." *Id*. at 1086 (quoting 50 C.F.R. § 402.16(a)).

Defendants point to a 2019 rulemaking in support of their position, Defs' Br. at 29–30, but that rulemaking did not substantively change the reinitiation provisions at 50 C.F.R. § 402.16(a) as applied here to state water quality standards. *See* 84 Fed. Reg. 45,017–018 (Aug. 27, 2019). To the contrary, the Services' limited purpose of that rulemaking was to "clarify that the duty to reinitiate consultation does not apply to an existing programmatic land plan prepared pursuant to FLPMA . . . when a new species is listed or new critical habitat is designated." *Id.* at 44,976. FWS' asserted "disagreement" with the *Cottonwood* decision was likewise expressly limited to the Ninth Circuit's holding that "the mere existence of a land management plan is an affirmative discretionary action subject to reinitiation." *Id*. But in any event, an agency that "disagrees" with binding appellate precedent is still bound to follow it, just like district courts.[6] *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. CV-20-00020-TUC-DCB, 2020 WL 6710944, at *4 (D. Ariz. Nov. 16, 2020) (district courts are "bound . . . to follow clearly established Ninth Circuit law" regarding ESA consultation even where the agency disagrees).

Accordingly, the Court should look to the Clean Water Act to answer the "determinative question" of whether "discretionary Federal involvement or control over" state water quality standards "has been retained or is authorized by law." *Cottonwood*, 789 F.3d at 1086.[7] That question was persuasively answered by the Western District of Washington in *Wild Fish*

---

[6] The preamble to the Services' rule revising 50 C.F.R. Part 402 makes no mention of its application to the approval of state water quality standards, even though the Western District of Washington's decision in *Wild Fish Conservancy v. EPA*—which Defendants now take issue with, Defs' Br. at 31—had already been issued. 331 F. Supp. 3d 1210 (W.D. Wash. 2018).

[7] The Ninth Circuit's decision in *California Sportfishing Prot. All. v. F.E.R.C.*, 472 F.3d 593 (9th Cir. 2006), also relied on by Defendants, is inapposite: that case involved the issuance of a dam operating license to a single private entity over which the agency had no ongoing, discretionary involvement or control. *Id*. at 599.

*Conservancy*, based upon its reading of 33 U.S.C. §§ 1251(b) and 1313 as well as a 2001 Memorandum of Understanding between the Services and EPA in which they agreed that

> where information indicates an existing standard is not adequate to avoid jeopardizing listed species, or destroying or adversely modifying designated critical habitat, EPA will work with the State/Tribe to obtain revisions in the standard or, if necessary, revise the standards through the promulgation of federal water quality standards under section 303(c)(4)(B) of the CWA.

331 F. Supp. 3d at 1223 (quoting *Memorandum of Agreement Between the Environmental Protection Agency, Fish and Wildlife Service and National Marine Fisheries Service Regarding Enhanced Coordination Under the Clean Water Act and Endangered Species Act*, 66 Fed. Reg. 11,201, 11,203 (Feb. 22, 2001)).

FWS attempts to rely on its post-hoc letter to EPA from 2019 are unavailing. Defs' Br. at 32–34 (citing EPA019896–901). Most importantly, Defendants fail to ground their argument in the regulatory language, which requires reinitiation of consultation where "new information reveals effects of the action that *may affect* listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a)(2) (emphasis added). The "may affect" standard is not high, and even if FWS believes it can ultimately reach a "no jeopardy" conclusion following its consideration of the information and analysis contained in, e.g., the Idaho BiOp and studies cited therein, it must first engage in the consultation process. *See Nat. Res. Def. Council v. Rodgers*, 381 F. Supp. 2d 1212, 1248 (E.D. Cal. 2005). That consultation must take place not in a letter, but in a coherent and transparent process that accords with FWS' own consultation regulations.

In any event, the FWS letter does not explain why the many "studies on bull trout and related salmonids cited in the Idaho BiOp, and that were available at the time we were preparing the Oregon BiOp," should not now be considered, in light of the analysis reflected in the Idaho

BiOp. EPA019899. Further, that letter notes that the "new studies cited in the Idaho BiOp, and other information previously not considered in the Oregon BiOp, support the need for further investigation of a dietary or a tissue-based criterion for arsenic" (a topic that was key for FWS' jeopardy determination in Idaho), but again attempts to justify the agency's decision to ignore that information in Oregon based almost exclusively on its "chronic level of effects model." EPA019990. Such information reveals that Oregon's water quality criteria for toxics "may affect" bull trout "in a manner or to an extent not previously considered" and thus reinitiation of consultation is required. 50 C.F.R. § 402.16(a)(2).

## CONCLUSION

For the foregoing reasons, and for those reasons set forth in NWEA's motion for summary judgment, the Court should grant summary judgment in favor of NWEA on all claims, and deny Defendants' motion for summary judgment in its entirety.

Dated: February 5, 2021.

        Respectfully submitted,

        s/ James N. Saul
        JAMES N. SAUL, OSB No. 152809
        ALLISON LAPLANTE, OSB No. 02361
        LIA COMERFORD, OSB No. 141513
        Earthrise Law Center at
        Lewis & Clark Law School
        10015 SW Terwilliger Blvd.
        Portland, OR 97219-7799
        (503) 768-6929, jsaul@lclark.edu
        (503) 768-6894, laplante@lclark.edu
        (503) 768-6823, comerfordl@lclark.edu

        *Attorneys for Plaintiff Northwest Environmental Advocates*